# EXHIBIT 1b

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DONALD MORISKY<br><br>Plaintiff,<br><br>vs.<br><br>MMAS RESEARCH, STEVEN TRUBOW, DUSTIN MACHI RODNEY WATKINS<br><br>Defendants. | Case No.: 2:21-CV-01301-DWC<br><br>DECLARATION OF RODNEY WATKINS IN SUPPORT OF DEFENDANTS |

I, RODNEY WATKINS, make the following declaration.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration of my own personal knowledge.

2. I am a Certified Public Accountant (CPA). I live and work in Coronado, California.

3. I have served in the position of CPA for MMAS Research LLC and Steven Trubow since June 2018 to the present.

4. I hereby declare the truth for the following facts concerning my accounting services for MMAS Research LLC and Steven Trubow for the period following the execution of their CR2A settlement agreement with Donald Morisky.

5. To prepare this Declaration, I have reviewed all the financial records in my

DECLARATION OF RODNEY WATKINS - 1

Virgo Law LLC
119 1st Ave. S., Ste. 310
Seattle, Washington 98104
(206) 569-8418

possession.

6.  To the best of my knowledge, As of May 22, 2024, the total assets of MMAS Research LLC were $2510.00 (See Umpqua Bank Letter)

7.  To the best of my knowledge, As of May 22, 2024, the total assets of Steven Trubow were $5414.44 (See Umpqua Bank Letter)

8.  To the best of my knowledge as of May 22, 2024, Neither Steven Trubow or MMAS Research LLC had any credit card accounts or secured revolving credit loans.

9.  To the best of my knowledge as of May 22, 2024, Neither Steven Trubow or MMAS Research LLC had any securable assets; property, stocks, bonds, life insurance, or retirement accounts to borrow against other than one seven-year-old automobile with a Blue Book Value of $20,000.


*(Signatures on next page)*

DECLARATION OF RODNEY WATKINS - 2

**Virgo Law LLC**
119 1ˢᵗ Ave. S., Ste. 310
Seattle, Washington 98104
(206) 569-8418

I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on May 22, 2024.

_____
RODNEY WATKINS, Affiant

/s/ Patricia Ray    Pennsylvania Bar# 31989
The Law Office of Patricia Ray
5 Old Mill Road, Freeport PA 16229 Telephone: 215-908-6810 raypatricia@yahoo.com


/s/ Brett Harris    Brett Harris, WSBA #55680 VIRGO
LAW LLC
119 1st Ave. S., Ste. 310
Seattle, WA 98104
Telephone: (206) 569-8418 Brett@virgolawseattle.com

DECLARATION OF RODNEY WATKINS - 3

 **UMPQUA BANK**

Umpqua Bank

201 Western Ave

Petaluma, CA 94952

05/22/2024

To Whom it may concern,

This letter verifies that, as of May 22, 2024, Steven Trubow has an account with Umpqua Bank. Below are the records related to the account:

Type of Account: Personal Checking

Account Number: 3968073514

Current Balance: $5,414.44

Date Opened: 08/18/2022

Thank you,

Jesse Fuentes

Personal Banker

 **UMPQUA BANK**

Umpqua Bank

201 Western Ave

Petaluma, CA 94952

05/22/2024

To Whom it may concern,

This letter verifies that, as of May 22, 2024, MMAS Research LLC has an account with Umpqua Bank. Below are the records related to the account:


Type of Account: Business Checking

Account Number: 4862260215

Current Balance: $2,510.15

Date Opened: 08/19/2022


Thank you,

Jesse Fuentes

Personal Banker

1          IN THE UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON

3

4   MORISKY,                       )
                                   )   No. 2:21-cv-01301
5                      Plaintiff, )      RSM-DWC
                                   )
6          v.                      )
                                   )
7   MMAS RESEARCH LLC, et al.,     )
                                   )
8                      Defendant. )

9        **VERBATIM TRANSCRIPT OF PROCEEDINGS**

10              **OCTOBER 19, 2023**

11

12

13                  Before the
            Hon. David W. Christel

14

15     Appearing via videoconference from

16        United States Courthouse
          1717 Pacific Avenue
17        Tacoma, WA 98402-3200

18

19

20

21

22

23

24     Jessica L. Turner, CCR No. 3187
                Court Reporter
25       Chehalis, Washington  98532

                                                    1

1                          **APPEARANCES**

2

3       For the plaintiff:

4                       F. CHRIS AUSTIN
                        Wiede & Miller, Ltd.
5                       10655 Park Run Drive, Suite 100
                        Las Vegas, Nevada  89144

6                       AMANDA BRUSS
                        Bruss Legal PLLC
7                       7550 East 53rd Plain, Unit 172464
                        Denver, Colorado  80238

8

9       For the defendant:

10                      PATRICIA L. RAY
                        David & Raymond International
11                      Patent Group
                        108 North Ynez Avenue, Suite 128
12                      Monterey Park, California  91754

13                      BRETT CARLTON HARRIS
                        Virgo Law Firm
14                      119 1st Avenue South, Suite 310
                        Seattle, Washington  98104

15

16

17

18

19

20

21

22

23

24

25

                                                        2

```
 1          (The following took place on October 19, 2023:)
 2          THE CLERK:  Good morning.  The U.S. District
 3     Court for the Western District of Washington is now
 4     in session.  The Honorable David W. Christel
 5     presiding.
 6          THE COURT:  Good morning, everyone.  The Court
 7     is hearing the case of Morisky v. MMAS Research LLC
 8     and other defendants.  Case number is 21-1301.
 9          Counsel, please make your appearances, first
10     for the plaintiff.
11          MR. AUSTIN:  Yes.  Good morning, your Honor.
12     Chris Austin and Amanda Bruss for the plaintiff,
13     Dr. Donald Morisky.
14          THE COURT:  All right.  Good morning to both of
15     you.  Mr. Austin, are you going to take the lead
16     today on oral argument?
17          MR. AUSTIN:  We have divided these up since we
18     divided them up in the briefing, so to some degree,
19     there will be a little bit of back and forth.  But
20     based on what Your Honor was looking for, I think I
21     probably have a little more than Ms. Bruss does in
22     our response today.  But they will be topic by topic.
23          THE COURT:  Okay.  Very well.  Thank you.
24          And for the defendants.
25          MS. RAY:  Hello, Your Honor.  This is Patricia
```

3

1    Ray.  I'm representing the defendants.  And also,

2    Brett Harris is here I believe.  I will be doing most

3    of the speaking, but Mr. Harris may have some

4    information to add.

5              THE COURT:  All right.  Good morning, Ms. Ray.

6         And good morning, Mr. Harris.

7              This case, so also, we're obviously proceeding

8    by Zoom.  No portion of this hearing can be recorded

9    in any way.  We do have a court reporter who is

10   reporting the proceedings this morning.  We've also

11   got some personnel from the court who are not

12   participating but are listening in to today's

13   proceeding.

14             Several motions are pending in this matter.

15   I'll list them for the record.  We've got plaintiff's

16   motion for further sanctions; that's at Docket 154.

17   Plaintiff's got another motion for sanctions at

18   Docket 156.  Plaintiff has a third motion for

19   sanctions and contempt at Docket 158.  There is a

20   motion to stay, or in the alternative, to amend the

21   scheduling order; That's docket 164.  And then we've

22   got defendant's motion under Federal Rule 54(b),

23   Docket 162.

24             And it sounds like, Mr. Austin, you and

25   Ms. Bruss received the email where I tried to

                                                          4

1    structure today's argument, so you've received that.

2        Ms. Ray, did you and Mr. Harris receive that

3    email?

4        You are on mute, Ms. Ray.

5        MS. RAY:  Yes, we did.  Yes, we did, Your

6    Honor.

7        THE COURT:  Okay.  Good.  Very well.  I've

8    looked at the motions, and I tried to structure it in

9    a way that helped get to the argument in an efficient

10   way.  So I appreciate the fact that counsel have

11   reviewed that and are ready to proceed in that way.

12       I'll just indicate we're going to have to take

13   a break at 10:15 to 10:30.  The Court has an

14   earthquake drill that is happening today, and it just

15   happened to occur right in that time frame.  So when

16   we do that, Counsel, you don't need to drop off the

17   Zoom.  You can just remain.  But I will drop off and

18   will go out of the session.  I'm planning to return

19   at about 10:30.  So we will keep that in mind.  We

20   will just adjust as needed, so.

21       Well, with that, let's start with that first

22   argument, which is the request for sanctions

23   regarding the destruction of the laptop.  I'll first

24   hear from plaintiff on that.  And I'll -- is that

25   you, Ms. Bruss, or --

1          MS. BRUSS:  Yes, Your Honor.  That would be me.

2          THE COURT:  Okay.  So please proceed.

3          MS. BRUSS:  Thank you, your Honor.  And I will

4      say, the motion is -- our first motion at 154 was not

5      limited to the laptop, although that was the primary

6      issue in that motion.  That motion was also based on

7      a lack of production of documents, privilege log,

8      interrogatories, and failure to appear at a

9      deposition.

10          But as for the laptop issue, our argument, as

11      we put forth in our brief, is primarily that the

12      laptop contained information.  We don't know the

13      scope of that information.  What we do know is that

14      the defendant testified that all of the licensing

15      documents, negotiation documents, settlement

16      agreements, and things of that nature were on that

17      laptop, were not produced, and were destroyed and

18      then thrown away before we had an opportunity to

19      review it but after we asked for the documents.

20          So from the timeline that we've been able to

21      piece together way after the fact -- again, we

22      weren't told any of this during the course while it

23      was happening.  We didn't know the laptop had the

24      documents.  We didn't know the laptop had been broken

25      and was being held.  We didn't find out it was thrown

                                                        6

1    away until after it happened.  But all of that had

2    happened while we were filing motions to compel,

3    while we're trying to meet and confer, while we were

4    asking for documents.

5          So we believe that the fact that the hard drive

6    was thrown away in the middle of motion practice

7    tends to indicate that there was probably information

8    on there that was useful to us.  And at the end of

9    the day, we don't know what was there, but we know we

10   can't have that information anymore.

11         And so at this point, we are left without a

12   large chunk of the evidence that we need to make our

13   case through no fault of plaintiffs.  We have been

14   trying desperately to get this information since last

15   fall, for over a year.  And it wasn't until I think

16   March, this last March that the hard drive is thrown

17   away.

18         So from our perspective, you know, there's --

19   while we understand technological problems happen,

20   laptops break, there is no way to know whether we

21   could have recovered the hard drive.

22         From the testimony that we had, it was the

23   laptop broke because it was in a soft case instead of

24   a hard case.  Well, that would lead me to believe

25   that a screen might be broken or a keyboard, but the

7

1    hard drive itself should have been able to be

2    recovered, but we don't know because we never got the

3    opportunity to look at that.  So that, coupled with

4    the fact that, honestly, we are two years into this

5    case and we still don't have financial documents,

6    records of licensing, the bulk of what was asked for

7    in this case.  We still don't have it.

8        And at this point, we understand that there is

9    a public policy, a desire to resolve cases on their

10   merits.  The problem is this case can't be resolved

11   on its merits without the information that only

12   defendants had.  And they won't turn it over.  They

13   won't respond to document requests, interrogatories,

14   depositions.  They won't produce documents when

15   ordered by to this Court.  We still don't have a

16   privilege log.  So without compliance with

17   discovery -- and then when this Court issued

18   sanctions, they weren't paid.  So we don't know what

19   other recourse there is at this point.

20       So we understand that the ask that we're coming

21   to you with is a big one.  We do know that.  But at

22   this point, we don't know that it's appropriate for

23   plaintiff to continue to spend money, time, and

24   energy to get resolution on this claim when we are

25   the only ones showing up.

1          THE COURT:  So, Ms. Bruss, on that laptop, it

2     sounds like you've identified some of the topics or

3     categories of documents that were on there.

4          MS. BRUSS:  Yes, sir.

5          THE COURT:  And are you stating to the Court

6     that there is no other way to obtain those documents?

7          MS. BRUSS:  We don't know -- I mean, from the

8     defendant, presumably email correspondence,

9     correspondence regarding the negotiation of

10    settlements, negotiations about licenses, in theory,

11    I suppose we could get them.  I don't know who we

12    would get them from; I guess defendant's attorneys,

13    although those are defendant's agents and they should

14    have produced them in response to discovery a year

15    ago.  But also, who are the licenses issued to?  We

16    don't know because we don't have that information.

17    It wasn't produced in response to interrogatories.

18         So in theory, yeah, we could serve

19    interrogatory.  We could serve subpoenas on all the

20    parties on the other side of those transactions, but

21    we don't know who they are.  And defendants won't

22    tell us.

23         THE COURT:  So it sounds like plaintiff is

24    saying that you do know some of the categories of

25    information that was on that laptop and that you

                                                        9

1    don't have any way to try to obtain them from a

2    third-party source; is that correct?

3         MS. BRUSS:  That's correct, Your Honor.

4         THE COURT:  Okay.  And in your motion, you're

5    moving, I think, under the Court's inherent authority

6    to impose sanctions.  Are you also moving under

7    Federal Rule 37(e) on spoilation of evidence?

8         MS. BRUSS:  Yes, your Honor.

9         THE COURT:  What is your argument on Rule

10   37(e), if you can summarize it for me?

11        MS. BRUSS:  Well, our argument is similar.

12   It's that the defendant knew that this information

13   was relevant and discoverable, was under a duty to

14   preserve and disclose it, and didn't do that.  And at

15   this point, you know, we don't have any other

16   recourse to obtain these documents.

17        THE COURT:  Okay.  And in terms of sanctions,

18   you are asking the Court to -- case dispositive

19   sanctions I think is your primary request.  What is

20   the alternative to that?

21        MS. BRUSS:  Your Honor, that's the problem is

22   that we don't know that there is a viable

23   alternative.  I mean, the other alternative would be

24   I suppose an order by this Court to produce this

25   information, but we've already done that.  Or the

10

1    Court could order sanctions to be paid, and we've

2    already done that.

3        At this point, I don't know how we compel the

4    other party who has access to these documents or the

5    ability to recover some of them, we don't know how to

6    get them to comply because nothing has worked thus

7    far.

8        So, You know, in theory, also we could ask for

9    a jury instruction that whatever was on the laptop

10   would have been unfavorable to the defendants, but

11   the problem is, we need these documents to show who

12   the license -- who was issued licenses, what those

13   licenses were for, the fees that were paid.  We have

14   no way of proving damages without any of these

15   financial documents.

16       And while the defendants are saying now that

17   there were not financial documents on the laptop,

18   they still haven't produced financial documents, for

19   the most part.  But also the licenses would tell us

20   how much was paid.  We don't have that information.

21   So that's -- that's crucial for us to either to

22   also -- to make our case and also to prove damages.

23       So I don't know how an adverse inference would

24   help.  We don't have numbers.  We don't have the

25   facts that we need.  We know that some licenses were

11

1    issued, but we don't know to who.

2        THE COURT:  And it sounds like you are saying

3    you don't know to whom those licenses were issued and

4    you don't know what revenues were produced, if any,

5    as a result of those licenses and that plaintiffs

6    have no other way to determine that information; is

7    that plaintiff's position?

8        MS. BRUSS:  Yes, Your Honor.  We acknowledge

9    that we could probably get some pieces of information

10   if we subpoenaed defendant's agents, although we

11   believe at this point that's not appropriate for us

12   to have to spend more money trying to get documents

13   that frankly are within the possession, custody, and

14   control of the defendants and should have been

15   produced a year ago.  But even assuming that we are

16   going to go down the road, reopen discovery, spend

17   another year on the case and send out a bunch of

18   subpoenas, I don't know that we would get a complete

19   picture even through that process at this point.

20       THE COURT:  So you wouldn't get a complete

21   picture.  How is it going to be shored?  I mean,

22   what -- because if you did some third-party

23   subpoenas, you would get some information presumably;

24   right?

25       MS. BRUSS:  In theory, yes.  We don't know

12

1    because we didn't know we would even need to be

2    sending out subpoenas during the discovery period

3    here.  So we need to start with figuring out who to

4    send subpoenas to.  I suppose defendant's attorneys,

5    agents, their financial -- their bookkeeper, which we

6    didn't know.  Apparently he has documents, so we

7    could subpoena him.  And then once we got those

8    documents, we could go through them, send out new

9    subpoenas to find information from the licensing

10    partners, but again, we don't know if that's even

11    going to get us anywhere, because we don't know if

12    there were licensed issued to third parties where the

13    attorneys weren't involved, for example.

14          THE COURT:  Yeah.  I understand that.

15          So at some point, plaintiffs learned about this

16    broken computer, this lost laptop, and at that point

17    you -- the plaintiff has not yet submitted any

18    third-party subpoenas or made any other efforts to

19    obtain the information that might have been on that

20    laptop from any third-party sources; correct?

21          MS. BRUSS:  That's correct.  Discovery had

22    already closed, and we had extended the discovery to

23    be able to take defendant's deposition.  And this

24    Court had ordered production of a bunch of documents.

25    So at the time, we had assumed or believed that

13

1    defendants would comply with the Court's order and

2    produce documents.  And so I guess in theory, we

3    could have served subpoenas, but I'm not entirely

4    sure who we would have served them on prior to the

5    depositions, because that was all happening when the

6    Court had already compelled defendants to produce

7    things.

8         THE COURT:  Okay.  So just to confirm, you

9    learned about the lost laptop after the close of

10   discovery; is that correct?

11        MS. BRUSS:  Yes, sir.  Yes, your Honor.

12        THE COURT:  All right.  Anything else,

13   Ms. Bruss, on the laptop?

14        MS. BRUSS:  That's all I have, your Honor.

15        THE COURT:  Okay.  Ms. Ray or -- Ms. Ray, are

16   you presenting on this one?

17        MS. RAY:  Yes.  Yes, Your Honor --

18        THE COURT:  Just a second, Ms. Ray.

19        MS. RAY:  (Audio disturbance.)

20        THE COURT:  Ms. Ray -- Ms. Ray.  Ms. Ray, we

21   can't -- your -- your connection is breaking in and

22   out.  I can't -- I haven't heard anything you've

23   said.

24        MS. RAY:  Yes.  Can you hear me?

25        THE COURT:  I can hear you now, but I can't see

14

1    you.

2              MS. RAY:  All right.  How about now?

3              THE COURT:  Well, we can hear you, but I

4    can't --

5              MS. RAY:  All right.  Let's see.  It says -- it

6    says I'm on video.

7              THE COURT:  Okay.  There you go.  So now I can

8    see your video.

9              MS. RAY:  Okay.  All right.  So, Your Honor,

10   this entire issue is blown up beyond proportion, that

11   the idea of the laptop was mentioned by Mr. Trubow in

12   his deposition, but Mr. Austin, who was conducting

13   the deposition, didn't allow him to explain that the

14   laptop had broken years before.  It was a dead -- a

15   dead laptop with very little on it except training

16   materials.  When Mr. Trubow tried to explain that it

17   was used for training, he was cut off and he couldn't

18   explain.  He said specifically there was no financial

19   documents on that laptop.  It was simply a training

20   laptop.

21             And it broke when it fell out of his backpack,

22   and then it fell apart.  He put it in the garage and

23   later on threw it away.  And it was no, like,

24   intentional act to hide discovery.  There was pretty

25   much nothing there of interest on there.  So the

15

1    plaintiff's attorneys have used this to blow it up

2    into a situation where they say they can't get

3    evidence, so they use it as an excuse.

4        To redouble the situation, plaintiff's

5    attorneys keep complaining that they can't get

6    categories of document production.  But, Your Honor,

7    we have produced everything available.  There really

8    is very little in the licensing documents.  There is

9    nothing for a privilege log.  There were no financial

10   documents on that laptop, and Mr. Trubow contacted

11   his -- during the deposition, contacted his

12   accountant and had financial reports for the company

13   produced and everything that we have has been

14   provided.

15       If plaintiff's attorneys would like to go

16   forward with other approaches to getting information

17   they claim that they don't have, which we would

18   provide if we had it, they should go ahead and do

19   that.  They should go ahead and do subpoenas to the

20   joint representation attorneys.  They should do

21   subpoenas for the things they need -- they say they

22   need to get, because starting in May, I've

23   provided -- I went over the document request

24   carefully with -- with the client and went through

25   everything we could possibly get to produce, and we

16

```
 1         provided that.  We sent them in categories, in emails
 2         to Mr. Austin.  And then at Mr. Trubow's deposition,
 3         we went over those categories.  There was
 4         questioning.  We provided everything we could, and
 5         during the deposition as topics came up, we provided
 6         additional documentation.  We went through everything
 7         that we could to give documents and answers to
 8         questions.
 9              So at this point, the laptop, it had very
10         little on it.  It was inadvertently -- it died, so
11         now we're -- we don't have anything else to provide
12         to the Court.  I mean not to the Court.  Either to
13         the parties.  And the laptop issue is just completely
14         an overblown excuse for -- it's a mountain out of a
15         mole hill.
16              THE COURT:  So, Ms. Ray --
17              MS. RAY:  -- your Honor.
18              THE COURT:  A question for you, Ms. Ray.
19              MS. RAY:  Yeah.  Sure.
20              THE COURT:  I'm taking your client's testimony
21         as being or as -- you're stating that your client
22         would say that he did not know about this laptop
23         prior to the deposition; is that correct?
24              MS. RAY:  Not exactly.  He knew that it was a
25         broken laptop that he hadn't used for a long time and
```

17

1    had thrown it away.

2         THE COURT:  And do we -- I'm not clear on the

3    record on this.  Do we know at what point he threw

4    away the laptop?  I mean, for instance, was it before

5    this case commenced?  Was it before the closing of

6    the discovery period?  At what point did he throw it

7    away?

8         MS. RAY:  It was some point in his move, in his

9    move in early 2023.  It was during -- after the case

10   had been filed, yes.

11        THE COURT:  The case had been filed, and was

12   discovery open at the time?

13        MS. RAY:  I think discovery may have started.

14   There was no discovery request made at that point,

15   but discovery was -- I think it had been initiated.

16        THE COURT:  And I think you said that he -- he

17   knew there was information on that laptop which

18   related to issues in this case; is that correct?  Did

19   he know that?

20        MS. RAY:  He -- he said it had training

21   materials on that, which I don't think he thought

22   that they were relevant to the case, and the laptop

23   was dead anyway.  In his mind, it wasn't relevant.

24        THE COURT:  Anything else, Ms. Ray, on the

25   issue of the laptop?

                                                    18

1          MS. RAY:  Not for now.

2          THE COURT:  What about sanctions, Ms. Ray?  I

3     mean, the plaintiff is asking for case dispositive

4     sanctions.  Let's assume the Court decides that there

5     should be some sanctions but not at that severity.

6     What would you recommend as an alternative sanction

7     if the Court heads in that direction?

8          MS. RAY:  I would say that it would be

9     appropriate to allow plaintiff to subpoena, so issue

10    subpoenas to get information from other sources.  I

11    don't know what information they want.  We produced

12    everything we have.  So they might -- they might go

13    forward with subpoenas to third parties, prior

14    attorneys of the organization who might have some

15    document -- who would have documents about the

16    licensing of the Morisky widget or something like

17    that.  So I don't know what they are trying to get,

18    because we provided everything we have.  But they

19    could go forward with third-party subpoenas.  And I

20    think that would be appropriate for them to get what

21    they wish to find.

22         THE COURT:  All right.  Thank you, Ms. Ray.

23         Ms. Bruss, would you like to reply?

24         MS. BRUSS:  I would, Your Honor.  I won't take

25    up too much time, but as far as whether the

1    defendants knew the documents on the laptop were
2    relevant, defendant raised the issue during his
3    deposition when we asked for documents.  So he knew
4    that the documents on the laptop were relevant to the
5    case because he brought it up and said, well, I don't
6    have any of that.  I had them on this laptop and it
7    died.  Actually, he said during his first deposition
8    that he still had the hard drive.

9         In terms of timing, discovery had been well
10   underway when he threw it away, because we were in
11   the middle of motion practice.  It was actually
12   shortly after the Court had asked us to go meet and
13   confer again on our motion to compel documents that
14   the laptop was thrown away.  It was on the eve of
15   defendant's deposition or his originally scheduled
16   deposition, and so frankly, should have been right in
17   his mind about what he was preparing to testify for
18   pursuant to Rule 30(b)(6).  So I don't think it's
19   believable that he didn't know that those documents
20   were relevant.

21        And frankly, it wasn't just training materials.
22   The defendant testified during his deposition that
23   the laptop had all of his licensing and settlement
24   agreements there.  So we -- and we submitted excerpts
25   from that deposition to Your Honor.  So they weren't

1    just training materials, and the defendant knew that

2    the information was on there that we needed, and then

3    threw it away anyway during the middle of motion

4    practice when we were filing the motion to compel.

5    So there is not any question on that.

6         In terms of, you know, just plaintiff, as a

7    sanction, having to seek documents from defendant's

8    attorneys and defendant's bank account, I just don't

9    understand how that is a sanction against defendants.

10   That's a cost plaintiffs are going to have to pay to

11   do those things, and frankly, those documents are

12   under the control of defendants.

13        THE COURT:  Could the Court in that situation

14   impose -- allow plaintiffs to do this third-party

15   supplemental discovery, subpoenas and such, and then

16   as part of the sanction, require the costs be paid by

17   the defendant?  I mean, why isn't that possible?

18        MS. BRUSS:  Well, because defendant doesn't pay

19   sanctions.  We already have a sanctions order of

20   thirty some thousand dollars they still haven't paid

21   that this Court ordered last spring.  So I don't --

22   yeah, in theory, the defense, I suppose, could assume

23   the costs of all this additional discovery, but they

24   are not paying for them.  And they refuse to do so

25   and said that they won't.

1          So -- and also the other issue is, my client

2     has a right to know the outcome of this case.  At

3     some point, he gets to be able to control his

4     intellectual property.  And while defendants are

5     claiming this is ruining their business, it has made

6     it impossible for our client to actually do anything

7     with his IP.  So putting it off for another year,

8     it's not just a financial cost, and he's paying his

9     attorney fees.  We have to send out subpoenas,

10    conduct depositions.  That all costs money.  I don't

11    know -- I don't know that -- I suppose you could

12    issue an order, but I don't believe it will be

13    complied with, based on everything that has happened

14    in this case.

15         THE COURT:  All right.

16         MR. AUSTIN:  Your Honor, just one

17    clarification.

18         THE COURT:  Yes, Mr. Austin.

19         MR. AUSTIN:  The weekend -- just to give you

20    the time here, in the deposition he testified that

21    the laptop was thrown away the weekend of

22    February 24th and 25th, which were the dates that the

23    Court set for his deposition in Washington.  And

24    those dates we had to ask permission for because they

25    were after the close of discovery.

                                                        22

1         THE COURT:  Okay.  Thank you, Mr. Austin.

2    Appreciate that.

3         All right.  Let's move on to our next topic for

4    today, which is the request for sanctions regarding

5    the May 30th and May 31st deposition.  Who is going

6    to argue that for the plaintiffs?

7         Is that you, Mr. Austin?

8         MR. AUSTIN:  It is.  Thank you, your Honor.  So

9    I think our briefing there too is pretty clear.  This

10   is kind of an unusual issue, I would imagine.  I

11   don't know that this comes up that often.  But if you

12   recall, Your Honor scheduled or compelled them to --

13   you know, doctor -- or Mr. Trubow to go forward with

14   depositions, and they had to be completed by the 31st

15   of May.  That was the Court's order.

16        We, in anticipation of trying to make sure we

17   had a buffer time to get that all done, scheduled the

18   depositions on the -- I believe they were the 24th

19   and 25th of May, so there would be some time.

20        And then further, because we directed to have

21   these depositions at Your Honor's order, the parties

22   could not agree on a location.  So they were held at

23   my office.  And to accommodate travel, we started

24   those depositions on the first day a little later in

25   the day to make sure that it would be available.

23

1           And I was hopeful we would be able to get them

2   both done in those two days, but we did not.  And so

3   we had about a half day of additional deposition that

4   needed to be taken after we completed what

5   depositions we could do on the 24th and the 25th.

6   And the parties amicably scheduled to have that final

7   deposition taken I believe on the 30th of May.  And I

8   agreed to do that remotely by Zoom, because at this

9   point, everybody had the documents.  We could

10  probably do it over Zoom and everybody could look at

11  the binders that I had provided to everybody.  So I

12  felt that would be doable.

13          And then I'm going to go to the timeline.  I

14  think that's in our briefing.  Because I think that's

15  really what it comes down to -- actually, I'm not

16  going to do that.  I'm just going to cut to the chase

17  on it, because the key point is we received notice --

18  after we set this up, we sent them notice from the

19  court reporter, which were the same court reporters

20  that we utilized for the depositions at my office, so

21  their contact information was already provided to

22  defendant's counsel.

23          I forwarded to defendant's counsel the email I

24  received confirming the start time of the deposition

25  and the login that would be necessary to do it

24

1    through Zoom and that was done a day -- more than a

2    day in advance.  On that email, when I scheduled it,

3    it identifies -- and we've had this discussion

4    before -- that there is a hard cut off deadline to

5    avoid nonrefundable fees for scheduling a remote

6    deposition or any deposition for that matter, because

7    at that point, the court reporter can no longer fill

8    that blank, that gap, and we're going to be obligated

9    to pay a minimum fee.

10        We received notice from plaintiff's counsel

11   after that nonrefundable deadline had passed the eve

12   before the original scheduled deposition that had

13   been extended by the parties on May 30th.  And so I,

14   recognizing that it -- you know, they are not -- I'm

15   not going to challenge somebody who says they are

16   ill.  That's -- I'm not going to get into that

17   discussion.

18        So my response was, again, to defendant's

19   counsel.  I've got a court order that's only extended

20   me until the 31st to get this done.  I am happy to

21   get on a phone and immediately see if we can't get

22   this pushed out or whatever you would like to do.

23   But because you're letting me know now when the

24   courts are closed, it's in the evening on the 29th,

25   and we are set to start the next morning, I will call

25

1    it off if you guys will, you know, if there is going

2    to be no issue with you all paying the late

3    cancellation or rescheduling fee.

4         And the response I -- and then you can go run

5    to the Court, seek to do an emergency teleconference

6    or whatever you need to do, and I will be available

7    for that.  And the response that I got from defense

8    counsel, I think it was Ms. Ray, was sounds like a

9    plan.  Literally, quote/unquote, sounds like a plan.

10        So I went forward and rescheduled the

11   deposition to the follow day, as I said I would do.

12   I will schedule it to the 31st.  That will give us a

13   whole day to get in front of the Court to get this

14   extended and, you know, then we can cancel it before

15   the cut off, that deadline I think was 4:30 or four

16   o'clock, something like that in the evening.  And

17   obviously, by that time, we would know or not know if

18   the Court was going to grant the extension.  I

19   expected the Court would grant the extension.  That

20   was not my concern, but I don't have the unilateral

21   power to do that.

22        And so I'm just telling her, here's what we

23   need to do.  I will do what I can to accommodate that

24   time frame.  I would rather it be rescheduled.  I

25   sent that information out first thing.  We're talking

26

1    seven o'clock, eight o'clock in the morning on the

2    30th and got no response for the rest of the entire

3    day.  In fact, never got a response until the

4    following morning.  And I repeatedly said, look,

5    where are you at?  I'm hanging by.  You know, it's

6    your burden to get ahold of the Court to seek the

7    extension.  No response at all.

8         And so the next -- I said I'm going to have to

9    go forward the next morning and at least make a

10   record.  Here's the call in.  You can call in and

11   explain what happened on the record as well.  She

12   didn't respond.  She didn't show up.  Instead, the

13   next morning, just as our court reporter -- as we're

14   getting set up to do the Zoom conference and we are

15   getting ready to go, I learn that they had filed a

16   motion, a separate motion, not on an expedited basis

17   to extend the discovery deadline based on the client

18   being sick.

19        At which point my client has already incurred

20   the fees for setting two depositions up.  And that's

21   what we are seeking to recover.  It's kind of -- I

22   guess, it's not a situation where I feel like there

23   was necessarily bad faith.  It was kind of neglect.

24   You know, neglect is my concern here because at least

25   one of those days the costs could have been readily

27

1          avoided.  And I wouldn't have rescheduled if they
2          were not going to go through this process.  I would
3          have just said we will make the record on the 30th
4          and then we will go forward and you can see what you
5          can get from the judge at that point.  But I went
6          through the process with the intent of helping give
7          them the space to get the extension and I feel like
8          it's like, you know -- it's like I'm getting -- my
9          client is getting punished because I tried to be
10         accommodating.  That's really what I feel like is
11         happening here on the cost.
12              And the other problem is this.  I mean, I feel
13         for somebody who is sick and then can't make it to
14         something.  But you know what?  If that happens to me
15         and I didn't get insurance when I bought my airplane
16         ticket, I still have to pay the cancellation fee.
17         They don't give me an out even though I have a
18         legitimate excuse.  And that's all we're asking for
19         here.  We're not asking for any of my time that was
20         associated with setting those depositions up or
21         changing the scheduling.  We're just asking for the
22         out-of-pocket costs my client had to incur to
23         reschedule these and pay the nonrefundable late
24         cancellation fees.
25              THE COURT:  All right.  Thank you, Mr. Austin.

1          Ms. Ray.

2          MS. RAY:  Okay.  Your Honor, I was trying to be

3     accommodating too.  We had conducted two gruelling

4     days of deposition in Las Vegas, and we couldn't --

5     Mr. Austin couldn't finish his questioning, so we

6     scheduled a continuation by Zoom.  And it was all

7     working out, very cooperative.  I was trying to

8     cooperate and be accommodating too.  But this was

9     Memorial Day weekend.  And on Monday when we were

10    off, Mr. Trubow, the deponent, contacted me and said

11    he had gotten COVID from his trip to Las Vegas and he

12    just couldn't get out of bed.

13         And I contacted Mr. Austin immediately and told

14    him we would have to postpone.  Could we postpone for

15    two weeks and I would try to contact the Court and

16    get some kind of extension so that we could conduct

17    the continuation of his deposition that he wanted

18    to -- the questionings that he wanted to do of

19    Mr. Trubow.  And I did my best to try to contact the

20    Court, calling the clerk, calling everybody I could

21    to see if we could get an extension for Mr. Austin's

22    continued deposition.

23         THE COURT:  Ms. Ray -- hold on, Ms. Ray.  But

24    you didn't file any -- you didn't file an emergency

25    motion of any sort at the time.

29

1      MS. RAY:  I did file a motion.  Yes, I filed a
2   motion for continuation.  I did.  And nothing -- and
3   I talked to Mr. Austin, and we -- it's not I wasn't
4   accommodating or cooperating.  We talked and he told
5   me that I needed to file that motion, which I did.
6   And he said you better do other things too, because
7   the Court is not going to hear that right away.  So I
8   called the clerk of the court.  I -- I just got no
9   response at all from the Court and -- I actually
10  emailed and contacted Mr. Austin numerous times.  He
11  called me and left messages.  It wasn't like we
12  weren't in contact.  I got nothing accomplished on
13  that -- the day the deposition was scheduled.  And
14  we -- we -- I can't believe he would say I wasn't
15  cooperating.  We were in, like, almost constant
16  contact.
17      So then I said, please put your deposition off
18  for a couple of weeks because Mr. Trubow, the
19  deponent, he has COVID.  And that COVID is not going
20  to be resolved for a couple of weeks.  And we agreed
21  on that.
22      But nonetheless, Mr. Austin rescheduled the
23  depositions.  On the second day, I called at the time
24  of the deposition, put on the record that I had tried
25  to reschedule it somehow and I wasn't able to do

30

1    that.  I did file a motion with the Court to postpone

2    the depositions for a couple of weeks, but I didn't

3    get any response.  So I think it's really untrue that

4    I was not in touch with him.  It was untrue that I

5    wasn't cooperating.  I was totally accommodating, not

6    to mention the fact that this was an entire

7    accommodation to Mr. Austin to continue his two plus

8    days of depositions, which we were completely willing

9    to do but it just -- it couldn't be worked out.  And

10    I -- I think he felt compelled to schedule

11    depositions, but they were like useless, because

12    Mr. Trubow was flat in bed and couldn't -- couldn't

13    testify.

14        So I don't know.  I think it's a total

15    mischaracterization that I wasn't accommodating or

16    didn't cooperate.  I filed a motion.  I called the

17    court.  I was -- I was in constant, like, action

18    trying to get this thing moved on, because we were

19    trying to do it.  So I think that's a

20    mischaracterization.

21        THE COURT:  Mr. Austin, at this point, have

22    plaintiffs completed the deposition of Mr. Trubow?

23        MR. AUSTIN:  Yes, Your Honor.  You will recall

24    that they did file their motion.  And I apologize if

25    Ms. Ray got the impression I was trying to say she

31

1    was not cooperative.  She just wasn't responding in a

2    manner that was timely enough to avoid us incurring

3    late fees, the late cancellation fee.  That was the

4    point to what I was trying to make.

5         THE COURT:  Okay.

6         MR. AUSTIN:  So but there was -- obviously, I

7    was trying to email her and contact her.  She did not

8    contact me back and say she was -- she had, you know,

9    I didn't hear about the issues with the Court until

10   the following day, by which time the deadline to

11   avoid late cancellation fees had passed.  And I'm

12   talking the day of the 30th, for the next day, the

13   31st, which was the day that we had scheduled the

14   last deposition.

15        So the problem is -- and I don't know why she

16   could not get ahold of the Court.  That's -- seems to

17   me that's not complicated.  But in any event, that

18   didn't happen on that end.  As I said, I had no other

19   choice.  So it wasn't until the morning of the 31st

20   that defendants filed their motion to continue the

21   deposition, but that's already past the late

22   cancellation deadline.

23        THE COURT:  Okay.

24        MR. AUSTIN:  And it's right when we're

25   beginning to take the record.  So and I may be

32

1    mistaken.  I can go back and look whether or not she

2    was there on the deposition.  That's fine.  That's

3    not my point.  My point is we incurred a cost here

4    that we -- we didn't -- we wouldn't have incurred if

5    she could have just made a call to the Court and

6    asked to get this set up ahead of time or filed an

7    emergency motion, let the Court know it's there, I

8    think the Court would have responded very quickly,

9    and that might well have happened.

10          Or at a minimum, she could have come back and

11   said I couldn't get ahold of anybody.  Let me know.

12   I would still have had to go forward is the problem,

13   because as you know, I can't unilaterally decide to

14   just reschedule another deposition after discovery is

15   closed, and I've only been given latitude to do it by

16   the order of the Court to that day.

17          THE COURT:  I understand.

18          MS. RAY:  Your Honor, Your Honor, can I speak?

19          THE COURT:  Yeah.

20          MS. RAY:  Just in my personal defense, I called

21   the clerk of the court, and they refused to set up

22   any kind of conference.  I couldn't do it.  And I

23   typed out a motion and filed it.  I did all the

24   things that Mr. Austin said I didn't do.

25          As a matter of fact, it's kind of personally

33

1    offensive, because I was really trying to get this

2    thing postponed because my client was sick.  He

3    couldn't do it.  I did all the things he said I

4    didn't do and Mr. -- I have even a voicemail from

5    Mr. Austin saying, please do this, please do that.

6    And this was all on his behalf.  I wasn't trying to

7    continue a deposition for myself or for my client.

8    It was all for Mr. Austin.  And for him to accuse me

9    of not doing these things, just personally I'm hurt.

10   And I really wish that everybody could understand, I

11   did every possible thing I could do to get this

12   postponed.  And I begged Mr. Austin to put it off for

13   two weeks, which actually occurred.  In the end, the

14   deposition got taken.  Case closed.

15        THE COURT:  All right.  Thank you, Counsel, for

16   that argument.  Let's move on to the next topic or

17   category, which is the request for sanctions for

18   defendant's failure to pay the previously ordered

19   costs and fees on the motion to compel, which that's

20   court order I think Docket 124 --

21        MR. AUSTIN:  Yes.

22        THE COURT:  -- is the order to compel.  On the

23   motion to compel.  And then there is defendant's got

24   a pending Rule 54 motion as well.

25        So, plaintiff, let's start with you.  Who is

34

1    going to make those arguments?

2         MR. AUSTIN:  I'm going to make this argument as

3    well, your Honor.

4         THE COURT:  Okay.

5         MR. AUSTIN:  So I think if you look at our

6    motion in that case, we laid out -- if I can pull it

7    up here -- I think a pretty clear timeline of the

8    events that took place.  But in quick summary, the

9    Court entered its order granting the motion for

10   sanctions and fees.  We then briefed the amounts.

11   The Court then entered an order I think on June 15th,

12   which is Docket 141.  And it laid out that there were

13   a total amount of fees of $33,525.92 and directed

14   defendants to pay that within 30 days of that

15   June 15th order.  That would then fall on July 15th

16   for them to pay it.

17        They didn't pay it.  Instead, on June 26th,

18   they filed a notice of appeal to the Ninth Circuit

19   for this order, which is not appealable, you know, at

20   that point.  It's not an interlocutory matter that

21   can go before the Ninth Circuit.

22        On July 11th, about four days prior to the

23   deadline to pay, the Ninth Circuit entered an order

24   to show cause stating that this is not a -- that this

25   order to pay sanctions under 37 -- so this is a 37(a)

35

1    sanctions grant -- is not appealable under 28 U.S.C.
2    Section 1291.  So -- and then ordered them to follow
3    a -- yeah.  Order to show cause why we shouldn't just
4    terminate the appeal because this is not an order
5    over which we have subject matter jurisdiction at the
6    Ninth Circuit.  That's the nature of that particular
7    order.  I believe we attached that to the motion --
8         THE COURT:  You did.
9         MR. AUSTIN:  -- as part of the process or we
10   might have referred it to you, the Court.  I can't
11   remember if I did it by cite or if I did it by
12   attaching the brief.  It's been a bit of time.
13        But I do remember that the Court specifically
14   cited to the Rosenfeld case, which is a Ninth Circuit
15   binding precedent in which it specifically said that
16   Rule 37(a) sanctions are generally not appealable.
17   They are not final so they are not appealable.
18        So they were given 21 days to comply with that
19   Ninth Circuit order.  In the interim, they -- you
20   know, they asked for an extension on August 7th to
21   have additional time to file that.  And then in that
22   interim period, they came to the Court and filed the
23   Rule 20 -- the Rule 54 motion seeking to have this
24   clarified as a -- as a final judgment, right, under
25   Rule 54.

36

1          So that's kind of the timing on when this took

2     place, but the problem is they never actually filed

3     their -- their extended briefing.  They never

4     responded to the Ninth Circuit's order to show cause.

5     And so on September 8th of this year, the Ninth

6     Circuit dismissed the appeal and issued an order

7     stating that the mandate would issue and be -- and

8     that this order would be the mandate within 21 days

9     of that order, which was September 29th.  So as of

10    September 29, 2023, there is no appeal.  It is -- the

11    case is closed.  The appeal is completely dismissed.

12         So then all that is -- so that gets you the

13    kind of the background and the timing of it.  And to

14    date, after that happened, we then bring this motion

15    because there has not been a payment and there has

16    been, in fact, representation by Mr. Trubow himself

17    that he will, quote, never pay it.  And so we felt

18    compelled to bring this to the Court's attention,

19    because what's the point of having a sanctions motion

20    or a sanctions order if the opposing party is going

21    to never pay it.  And so we felt like at this point

22    there is no -- there is no sanction amount that you

23    can issue that's going to actually result in a

24    payment to plaintiff.  We have been delayed by this

25    point now, here we are in mid October, this whole

1    process started a year ago just about, within a month

2    or so of a year ago.

3         THE COURT:  Right.

4         MR. AUSTIN:  As we were -- when we first sought

5    to have these depositions taken.  And we finally get

6    them all done, but it takes a motion to compel and it

7    takes an order of sanctions, and we still don't have

8    resolution on all of these issues that were pending

9    nearly a year ago that we have been seeking this

10   entire time.

11        So we moved for, in this case as well,

12   sanctions and case-ending sanctions.  Again, as

13   Ms. Bruss pointed out, we don't take that lightly.

14   We understand, but we just feel like we are at our

15   wits' end.  I don't know what we can do.  We have

16   tolerated them going to an appeal on an appeal we

17   think is frivolous, and we have tolerated the delays

18   that have taken place.

19        But my client has been out of pocket much more

20   than 33,000.  You'll recall, Your Honor, that you

21   discounted that fee.  Unfortunately, it wasn't

22   discounted to my client.  So they paid the total sum,

23   but -- and they paid a lot more as we have gone along

24   trying to just get documents here.  So they are out

25   and have not been repaid, and now they are informed

                                                      38

1    by opposing counsel they are never going to -- or

2    opposing party they are never going to get repaid.

3        So that gets us to the Rule 54 motion.  And I

4    think that motion is pretty clear.  I don't know if

5    there is anything that Your Honor would like to

6    specifically talk about.  But the case law in that

7    motion is quite clear from the Ninth Circuit.  Rule

8    37(a) sanctions and sanctions for fees, as well as

9    discovery orders, whatever category you want to put

10   this in, none of them fit the criteria required in

11   order to permit the Ninth Circuit to have subject

12   matter jurisdiction over that as a final order.  Even

13   if the District Court errs and claims it is a final

14   order, by their own case law, they will not accept

15   jurisdiction over it, because their case law is quite

16   clear it doesn't meet any of that criteria.

17       It's a little bit of a technical argument.  And

18   I laid that out as you go through for each of those

19   categories, but this is pretty clearly a Rule 37(a)

20   sanctions order that was issued by the Court.  That's

21   what the order stated for failure -- or as part of a

22   motion to compel, and that is by precedent not

23   appealable interlocutorily.  It can be a part of a

24   final judgment.  It can be brought up in a final

25   appeal, but it is not appealable at this point in

1    time and for a host of reasons.  And the key ones are

2    that it defeats the whole point of a sanctions motion

3    to motivate opposing parties to comply with discovery

4    if the -- if the opposing party can completely take

5    all the teeth out of that order and deprive the

6    sitting district court judge, and in this case

7    magistrate judge, of the case and the ability to

8    impose the order, and yet still force the opposing

9    party, in this case plaintiffs and Dr. Trubow, to go

10    forward and incur all the costs of proceeding to

11    trial potentially with a host of sanctions orders

12    that are never paid and waiting until they get to an

13    appeal.  At which point we never get anything we're

14    looking for and the case and the ability of the Court

15    to enforce its orders is neutered.  And so the Ninth

16    Circuit has made it quite clear in their Supreme

17    Court case law as well.  That's just not the rule and

18    it's impermissible to issue a Rule 57 final judgment

19    on a 37(a) sanction.  Thank you, your Honor.

20         THE COURT:  And, Mr. Austin, what is plaintiff

21    asking the Court to do in terms of supplemental

22    sanctions on that?  Is it the case dispositive

23    sanctions; is that what you're asking for?

24         MR. AUSTIN:  It is.  I don't know what else the

25    Court can do.  I mean, they have refused to pay

40

1    the -- pay the amount.  There has been no -- there is

2    an affirmative statement from the opposing party that

3    he is not going to pay it.  And so I don't know where

4    else we go.

5         THE COURT:  Well, couldn't the Court --

6         MR. AUSTIN:  Yeah.  Go ahead, Your Honor.

7         THE COURT:  Couldn't the Court, Mr. Austin,

8    just defer ruling or action regarding the failure to

9    pay and have it be considered as a set off or part of

10    the final judgment in this case after trial?  Why

11    couldn't the Court do that?

12        MR. AUSTIN:  Because the point of Your Honor's

13    order was not to issue a judgment.  The point was to

14    motivate the opposing party to comply with discovery.

15    And they -- and we'll get into that in the next

16    section.  They have not done that.  And there is

17    now -- no sanction has effectively worked to do that.

18    As a result, there is no power that the Court then

19    has.  There is no pressure that can be brought to

20    bear on them.

21        Remember, we are the plaintiff in this action,

22    so we are the one seeking the recovery or

23    clarification that we own the intelligent property

24    assets that we believe are contractually granted to

25    us.  And we also believe that we're entitled to

41

1    damages, although frankly, we're not confident that

2    we will recover damages.  So an offset of damages is

3    rather immaterial in this case to us.  The only

4    sanction that is meaningful to us is clarity that

5    Dr. Morisky has what he thought he had when he signed

6    the settlement agreement, the CR2A.

7         THE COURT:  Okay.  All right.  Thank you,

8    Mr. Austin.

9         Ms. Ray, what would you like to tell me on

10   this, your client's failure to pay?  Has he stated

11   that he will not pay or he cannot pay?

12        MS. RAY:  At the moment, your Honor, he cannot

13   pay.  But let's step back.  I'd like to deal with a

14   couple of points, and one of -- I want to step back

15   to the beginning about this sanctions motion.  But

16   also, I want to say that the matter is still pending

17   at the Ninth Circuit.  It's not over there.  An

18   appeal was filed.  We're waiting on a ruling on the

19   54(b), and it's still before the Ninth Circuit, the

20   whole thing.

21        But let's step back to the beginning, how this

22   sanctions motion came to be and what happened in

23   terms of the sanctions being ordered.  Mr. Harris was

24   involved --

25        THE COURT:  Ms. Ray, Ms. Ray, let me interrupt

42

1        you.  The Court's already made its ruling, and the

2        ruling concluded that Mr. Trubow was obligated to pay

3        the -- you know, the 33,000 and plus by a particular

4        date.  So I don't want to really get into the facts

5        or argument related that the Court considered before

6        the Court made that ruling.  Is that what you are

7        intending to do here?

8            MS. RAY:  No.  No.  But I just wanted to

9        mention the circumstances and why all of this has

10       come about.  So I just wanted to say I don't want to

11       get into the debate over your ruling or the Court's

12       ruling, but I just wanted to say that Mr. Trubow was

13       seeking some review of that.  And that's why that

14       appeal was filed, so that the situation could be

15       reviewed, the order could be reviewed, and we were

16       waiting to -- to hear from this Court in terms of the

17       54(b) motion.  And so that some review at the Ninth

18       Circuit could be held over this -- the sanctions

19       order.  And it's still pending.

20           So we're really -- I'm not aware of Mr. Trubow

21       saying he's never going to pay the sanctions.  You

22       know, that's -- possibly, but he says a lot of

23       things, and I think he was just kind of upset over

24       the amount.  And so we're -- yeah.

25           MR. HARRIS:  Your Honor, let me weigh in here

                                                          43

1    too.  The fact of the matter is he cannot pay -- this

2    is attorney Brent Harris representing MMAS

3    Research --

4         THE COURT:  Just a second.  Mr. Harris, just a

5    second.  Let me go back to Ms. Ray.

6         Ms. Ray, you didn't -- defendants didn't file

7    any objections to the order awarding fees and costs

8    because you indicated you wanted that reviewed, but

9    you didn't file any objections.

10        MS. RAY:  Yes, we did.

11        THE COURT:  To Judge Martinez?

12        MS. RAY:  Yes.  There was a -- excuse me for

13   interrupting.  Yes, we filed an objection, and we

14   asked for it to be lowered and there was some

15   response to that.  So that was filed.  And then after

16   that, because we had no other option, we did file the

17   appeal.  And we've been filing papers with the Ninth

18   Circuit to make sure that appeal gets heard.  And if

19   we don't get an order from this Court under 54(b),

20   then -- then we won't be able to sustain that in the

21   Ninth Circuit, but right now, it's still there.

22        THE COURT:  Okay.

23        MS. RAY:  And so whenever -- whenever

24   plaintiffs file their motion for sanctions, we just

25   said hopefully this Court can put a stay on this

44

1    whole thing until we hear from the Ninth Circuit.

2    And to be honest, Your Honor, I think your proposal

3    to postpone this until after the trial and the

4    decision is issued in this case and to deal with the

5    sanctions together with the whatever award or

6    whatever the jury finds in the case, I think that

7    resolves things.  So I would be -- I would be in

8    accord with your suggestion on that.

9         THE COURT:  Well, yeah.  Okay.  Well, thank

10   you.  It was just trying to probe what other

11   possibilities were.  I'm not suggesting that as the

12   direction the Court is taking.

13        Let me go to Mr. Harris.  Mr. Harris, cocounsel

14   with Ms. Ray, what did you want to tell the Court?

15        MR. HARRIS:  Yes, your Honor.  The fact of the

16   matter is, doesn't matter what Mr. Trubow said.  He

17   cannot pay.  That money does not exist.  So, you

18   know, the only option is to wait until there is a

19   final judgment on the merits at this point.  I don't,

20   you know, see how an IP dispute can be resolved, you

21   know, just because one party cannot afford to pay

22   sanctions.

23        And, in fact, Your Honor, you've mentioned that

24   the purpose -- or perhaps it was Mr. Austin, the

25   purpose of the sanctions was to ensure that defendant

45

1    complied with discovery, and the fact of the matter

2    is that he has complied since then.  So although

3    Mr. Austin is concerned that the Court is neutered in

4    this case, I would say that the Court's decision was

5    effective here.

6         THE COURT:  All right.  Thank you, Mr. Harris.

7    All right.  Let's move on to the request for

8    production and the interrogatories.  Let's take the

9    request for productions first, which was the subject

10   of the Court's order, Docket 124, where the Court

11   ordered defendant to produce documents.

12        Mr. Austin, just generally, is it your position

13   or the plaintiff that some documents have still not

14   been produced?

15        MR. AUSTIN:  Yes, your Honor.  If you will

16   recall the original motion to compel ordered the

17   defendants to produce documents which respond to all

18   22 requests for production.  We received an updated

19   and then a revised response to the request to produce

20   on May 15, 2023, the very deadline.  In fact, it was

21   still roughly being put together.  When that response

22   was produced, very few documents were yet produced

23   with it.  We then received a very ad hoc rolling

24   email of documents being sent to us over the course

25   of the next 10 -- 13 days between May 16th and

                                                    46

1    May 28th, well after the deadline and too late to

2    really be able to utilize a lot of these

3    documentations in connection with the deposition.

4         But I will tell you that even in looking at

5    just the response, the response only provides

6    documents, and the only documents that were produced

7    were identified as responsive to only Requests No. 3,

8    No. 5, No. 6, No. 7, No. 9, No. 10, No. 11, No. 12,

9    and No. 21.  No other response -- no other request

10   for production was identified in any response for a

11   document.  We had 22, so the balance -- to the

12   balance, there was no response provided as with

13   regarding the request for production.

14        Additionally, none of the documents we received

15   were Bates numbered, and in some cases, we received

16   over 300 documents at once purporting to be

17   responsive to half a dozen questions without any

18   delineation as to what they are responding to.  And

19   the requests are not necessarily of this -- you know,

20   requests are not necessarily the same.

21        So we are trying to go through and email a set

22   of documents that are very rough, not delineated

23   clearly between when one document ends and another

24   begins.  No index identifying which document is

25   which, what the title of the document is.  There is

47

1    clear question about whether even these documents are

2    complete, because they appear to have been cut from

3    email correspondences in some cases.

4        And even so, as I can get into in the details,

5    when you go in through each of those documents and

6    compare them against the requests, they are not

7    responsive.  But I do want to make one note.  In that

8    May 15th response to requests for production, the

9    request itself stops at 12.  It produces a response

10   up to 12, and then from 13 through 21, it's missing

11   any response at all.  There is no number 13, 14, 15,

12   et cetera, and no response to those requests for

13   production.

14       We then finally get a response to Request for

15   Production 21.  So all you're left with then is what

16   was in the original response that Your Honor

17   indicated was woefully inadequate and to which you

18   compelled them to supplement with additional

19   responses.  They disregarded your order in its

20   entirety as to those requests.  And those requests

21   were quite significant, just to let you know.

22       Request No. 12, these are all the documents

23   dealing with their counterclaims and affirmative

24   defenses.  We are asking for the documents that

25   support those claims.  That's 13 and 14 are documents

1    regarding the fifth, sixth, and eighth affirmative

2    defenses, 15 are documents regarding the seventh

3    affirmative defenses, Request 16 are documents

4    regarding the third counterclaim, Request 17 are

5    documents regarding the fourth counterclaim, as well

6    as 18, Document Request 19 are documents regarding

7    the sixth and seventh counterclaims, and Document 20

8    is with regard to all affirmative defenses and

9    counterclaims that were not otherwise addressed.  It

10    was a catch-all request.

11        THE COURT:  All right, Mr. Austin, let me make

12    sure I understand.  So you are saying Document

13    Request 12 through 20, 12 through 20 --

14        MR. AUSTIN:  Not 12.  13 through 20.  13

15    through 20.

16        THE COURT:  Okay.  13 through 20 defendant has

17    not responded to after defendant received the Court's

18    order on April 27, 2023.  You've received no

19    additional documents for those requests, Document

20    Requests 13 through 20; is that correct?

21        MR. AUSTIN:  That's correct, your Honor.  There

22    is no documents that are identified as responsive to

23    any of those.  And in the actual discovery document

24    in which you identify what document you are

25    providing, those numbers are not even included in the

```
1    response.  They skip from 12 to 21, 22.
2           THE COURT:  12 to 21 or 12 to --
3           MR. AUSTIN:  12 to 21.  Excuse me.  They skip
4    from 12.  So they go 12 and then the next response is
5    21.
6           THE COURT:  Okay.  All right.  All right.  So
7    they -- the series is Document Request 13 to Document
8    Request 20, those are the ones for which plaintiff is
9    stating you've not received any supplemental
10   documents; is that correct?
11          MR. AUSTIN:  That is.
12          THE COURT:  All right.
13          MR. AUSTIN:  And then as I said, as a general
14   rule, this was very difficult and cumbersome to go
15   into.  But as we got into them -- and I'll just kind
16   of give you another general.  This is also in our
17   motion in a general fashion, but I can go through
18   these granularly with you, you know, request by
19   request.
20          They are just the documents they submitted to
21   their amended complaint.  They are their self-serving
22   documents they had been trying to utilize in their
23   own pleadings or in their motions, so they are
24   cherry-picked.  They are picking, you know, a license
25   discussion and, you know, process for one license
```

50

1    agreement that they think gives them some grounds to

2    move against Dr. Trubow, but they are ignoring the

3    hundreds of license agreements that they acknowledge

4    in the CR2A that MMAS has entered into with third

5    parties.  We have no documents with regard to those

6    licenses.  None.  And yet they identify them as an

7    exhibit to the CR2A.  This is a list of all of our --

8    of all the parties with whom we have license

9    agreements.

10        So we have an idea of at least as of the time

11   the CR2A was entered into, this was the -- this was

12   what MMAS was doing.  These are the license agreement

13   that they had with people.  What we don't know is

14   what happened subsequent to that, because I don't

15   know that we've got into much of the merits here, but

16   CR2A provided them the opportunity to go out and

17   secure settlements and file lawsuits with Dr. Morisky

18   as a participant in the lawsuit, which would be

19   required because he is the copyright holder, against

20   infringers of the Morisky widget, which they claim to

21   have copyright of.  So it would have to be somebody

22   who was already a licensee.  That would be the only

23   person who would likely have access to that widget.

24   We clarify that in discovery.  That widget is

25   otherwise unavailable to anybody generally.  They

51

1    would have to have received a copy of it pursuant to

2    a prior license agreement of some sort so -- or prior

3    negotiation.

4         So we already know there is a number of license

5    agreements out there for which we received none of

6    the actual agreements.  These were all done by Trubow

7    and his lawyers while the lawyers represented both

8    parties, and at times might communicate with

9    Dr. Morisky.  It was expected and understood that

10   this was, as part of the compromise, this was driven

11   by Mr. Trubow and MMAS.  So that's what I'm kind of

12   telling you there.  We know there is a lot that is

13   missing because of that, and we know that these

14   documents they produced, many of them are just

15   nonresponsive.

16        And they are extraordinarily duplicative.  I

17   mean, we are talking about hundreds of pages that are

18   copied two -- two to five times.  I mean, you will

19   find the CR2A, which is 140-something pages all

20   together, multiple times is recopied and resubmitted.

21   My emails and my discussions that were -- that

22   were -- not my emails but there was a letter that was

23   sent out on behalf of my client to licensees to say,

24   hey, here is the status, that has been produced

25   multiple times because that has become a tar baby

52

1    issue for the defendant in this case.  So a lot of

2    these things are our own, are our client's email

3    correspondence back and forth but are not responsive

4    to the key requests we are asking for.  And so with

5    the Court's indulgence, I'm happy to go through the

6    specific requests.

7         THE COURT:  You know, I think what I'd like to

8    do is hear from Ms. Ray just generally, but I'm

9    looking at the clock and we need to take our break

10   for the earthquake drill that is going to happen here

11   shortly.

12        So, Ms. Ray, when we get back I just -- I would

13   like to hear from you as to, in particular, whether

14   you and your client produced any documents responding

15   to Document Requests 13 through 20, and then I'd like

16   to get your general argument on this motion regarding

17   your client's response to those requests for

18   production.

19        And it looks like, Counsel, that we'll probably

20   have to go through each one and each request for

21   production and just go through it each one at a time.

22   In fact, that's probably what I would plan to do

23   after I hear from Ms. Ray about the gap on 13 to 20.

24        So, Counsel, let's -- court will be in recess.

25   We will reconvene at 10:30.  And we will see you back

53

1    here then.

2         Counsel, I don't know whether you want to try

3    to meet and confer during that gap.  You certainly

4    can.  I mean, I will be in the breakout room, but

5    maybe if you don't think that is productive, then we

6    will just reconvene at 10:30.  All right.

7         Would you like an opportunity to discuss the

8    issues, Mr. Austin, on this particular request for

9    production or discovery, or would that not be

10   fruitful?

11        MR. AUSTIN:  I don't think it would be fruitful

12   at this point, your Honor.  It would take way more

13   than ten minutes.

14        THE COURT:  Okay.

15        MR. AUSTIN:  To try and go through that

16   process.  And at this point, we've had a year of

17   seeking these documents.

18        THE COURT:  Okay.  All right.  With that -- all

19   right.  With that, the Court will be in recess and

20   see you back here at 10:30.  Thank you.

21      (A recess was taken.)

22        THE CLERK:  Good morning.  The U.S. District

23   Court for the Western District of Washington is now

24   again in session.  The Honorable David W. Christel

25   presiding.

```
 1              THE COURT:  Just waiting for everyone to get
 2      back to the Zoom.
 3              MS. RAY:  I'm back.  I was disconnected, so I'm
 4      back.
 5              THE COURT:  Ms. Ray, I can't see your video.
 6              MR. HARRIS:  And for the record, your Honor, it
 7      looks like we've had a new party join us.
 8              MS. RAY:  That's me.
 9              MR. HARRIS:  No.  It's some guy from the moving
10      party, I think.  Maybe they just changed their name.
11              MS. RAY:  I think that's me.
12              MR. HARRIS:  Looks like Dr. Morisky perhaps.
13              THE COURT:  Mr. Austin, I don't have you on
14      video.  Ms. Bruss, could you maybe email him and --
15              MS. BRUSS:  I was just on the phone with him
16      about two minutes ago.  So I think he -- he was
17      logging on when I spoke to him, so he might be having
18      a technical problem, but he was just in his office
19      two minutes ago.
20              THE COURT:  Okay.  We will give him a few
21      moments.
22              Ms. Ray, we are still waiting for your video?
23      Okay.  There you are.
24              MS. RAY:  There I am.  Okay.
25              THE COURT:  We're waiting for Mr. Austin to
```

1    come back.  And I'll be right back in a moment.

2          Mr. Austin, are you with us?

3          MR. AUSTIN:  I am.  Just -- just racing back,

4    Your Honor.

5          THE COURT:  Okay.  Good.  Thank you.  Thank

6    you.  All right.

7          We're back on the record.  Case No. 21-1301.

8    Our court reporter is with us.  Thank you,

9    Ms. Turner.  Or let me just confirm with Ms. Turner.

10   Ms. Turner, are you with us and are you able to see

11   and hear everybody?

12         THE COURT REPORTER:  Yes, Your Honor.  I am

13   here and I am able to see and hear.

14         THE COURT:  Okay.  Great.  Thank you,

15   Ms. Turner.

16         We also have it's identified as a Donald M.

17   Who -- is that a client?

18         MR. AUSTIN:  Yes, your Honor.  That would be my

19   client.  That's Dr. Donald Morisky.

20         THE COURT:  All right.  Thank you.  Thank you.

21         All right.  Let's go back to where we left.

22   And, Ms. Ray, first question for you is whether you

23   and your client responded to the Document Requests 13

24   to 20 after the Court entered the -- after the Court

25   entered the order directing him to respond on or

```
 1    before I think it was May 15th.  Ms. Ray.
 2            MS. RAY:  (Audio disruption.)
 3            I can't hear you, Ms. Ray.
 4            MS. RAY:  (Audio disruption.)
 5            THE COURT:  Ms. Ray, you are not coming
 6    through.
 7            MS. RAY:  (Audio disruption.)  Can you hear me?
 8            THE COURT:  Nope.
 9            MS. RAY:  Can you hear me?
10            THE COURT:  Nope.
11            MS. RAY:  Okay.  (Audio disruption.)
12            THE COURT:  We can't hear you, Ms. Ray.  Do you
13    want to maybe log off and log back in and see if that
14    works for you.  Maybe turn off your video.
15            MS. RAY:  (Audio disruption.)
16            THE COURT:  Ms. Ray, maybe just turn off your
17    video.
18            MS. RAY:  (Audio disruption.)
19            THE COURT:  Sometimes if you turn off your
20    video, you can just participate audibly if you want
21    to do that.  Why don't you try that, Ms. Ray?
22            MS. RAY:  Okay.
23            THE COURT:  Ms. Ray, are you able to turn off
24    your video?  We are not hearing you at all.
25            MS. RAY:  (Audio disruption.)
```

57

1          THE COURT:  Looks like Ms. Ray disconnected.

2          Mr. Harris, are you -- I know you and Ms. Ray

3     have split up the arguments today on the motions.

4     Are you in a position to argue this motion on behalf

5     of the defendants?

6          MR. HARRIS:  I can, your Honor.  I was not

7     directly involved in the production of documents or

8     any responses to discovery, so I -- I know our

9     position on it, but I don't -- I can't speak directly

10    to any specific questions.

11         THE COURT:  All right.  Well, let's -- we will

12    just wait for Ms. Ray to see if she can reconnect.

13         MS. RAY:  Hello.  I might be back.  Am I?

14         THE COURT:  Okay.  There you are.

15         MS. RAY:  I went to my laptop and I got in

16    better.  So I apologize for that so I'd like to go

17    forward.

18         THE COURT:  All right.  Please proceed,

19    Ms. Ray.

20         MS. RAY:  All right.  On the -- you asked me

21    about the document -- the responses to the document

22    requests.  So the situation is I'm not sure what

23    happened to those responses, but what I did with the

24    client, with Mr. Trubow is I --

25         THE COURT:  Wait, wait, wait.  Did you -- I'd

1    like to get your answer to the question.  Did you and

2    your client respond to Document Requests 13 to 20 by

3    the May 15, 2023, deadline or not?

4         MS. RAY:  Yes, I believe we did, Your Honor.  I

5    sat down with Mr. Trubow and went through every

6    document request and we made a response.  Now, what

7    happened to the actual stated responses, I -- I'm

8    not -- I'm not sure.  But we did respond to all of

9    the requests and uncovered every possible document

10   that we could produce on those categories.

11        Some of the categories, your Honor, Mr. Trubow

12   said that he doesn't have documents because they are

13   with the joint counsel who represented both plaintiff

14   and defendant.  Many of the licensing documents from

15   the past are in the hands of those joint

16   representation lawyers which are each equally

17   accessible by plaintiff.  So, A, he doesn't have

18   files on them.  They are with the lawyers, and also,

19   plaintiff can get them from those -- those parties.

20   So there was nothing produced there.

21        There may be other categories that plaintiff is

22   seeking that is -- there is nothing there.  But I

23   went through document by document request and

24   produced everything that is available.

25        Now, as far as that 13 to 21, I don't know how

1    they got missed in terms of the response documents.

2    If need be, we can go through those and identify

3    whether or not they have been addressed.  The second

4    thing is, on that -- that's a topic of what documents

5    have been produced.

6    So I wanted to be very thorough.  There was a

7    couple of sets of production, and some of it may have

8    been duplicative.  That is because we were trying to

9    produce everything possible.

10    Now, first, I contacted Mr. Austin and asked

11    him how he would like the production done.  And he

12    said, as long as they were done by categories and

13    presented to him in terms of what areas the documents

14    related to, that would be okay.  I thought we did a

15    pretty good job of that, although they weren't Bates

16    numbered, that is true.  They weren't Bates numbered,

17    but they were presented by categories and there was

18    nothing that was privileged to identify.  So there

19    was no privilege log presented.  And everything that

20    we have was produced.  And one more thing.  I --

21    that's all.  That's all for now.

22    THE COURT:  That's all for now?

23    MS. RAY:  Yeah.  You may have more questions.

24    THE COURT:  Okay.  Well, I just want to go back

25    and clarify.  You said you didn't know what happened

60

1    to your responses to Requests for Production 13 to 20

2    but --

3        MS. RAY:  We did go -- within getting the

4    production together, I did go through all of the

5    document production requests and got documents from

6    defendant on every category.  So if need be, if we

7    need to go through those requests again and make sure

8    the documents are produced on those areas, that's

9    acceptable to me.  But I -- I don't have any -- any

10   answer on whether -- on what happened to those actual

11   responses.  I don't know.

12       THE COURT:  All right.  Mr. Austin, how would

13   you like to respond to that?

14       MR. AUSTIN:  Well, I -- it's the first time

15   I've heard that there was even a discussion with

16   counsel.  They had come up with documents responsive.

17   The reality is we are now so far past the deadlines

18   here.  The intent of the Court's May 15th deadline

19   was to afford plaintiff an opportunity, although very

20   brief one, to review documents before going forward

21   with depositions that were the next week.  And we

22   never got those documents, and we had to go forward

23   with depositions without the benefit of them.

24       In any event we, even in the rolling production

25   that was produced came too late, were too close to

61

1    the deposition for them to be of any use to us in

2    those depositions.

3         Let me just address a few things that she

4    raised.  I think it's important to understand,

5    pursuant to the parties' agreement, the joint counsel

6    was joint counsel, but they were entirely controlled

7    by, retained through the efforts of Mr. Trubow.  We

8    did not have their contact information, unless that

9    was provided to us from Mr. Trubow or we received an

10   email from one of the joint counsels.

11        In our request for interrogatories, we asked

12   for all of the contact information for all of the

13   joint counsel.  We received no contact information

14   for any of the joint counsel.  So to say that we can

15   subpoena them is impossible.  We might be able to

16   subpoena a few from our own research, but that was

17   not -- they were not as easily accessible to us and

18   just so you are aware, there were -- the vast

19   majority of a lot of these license agreements

20   occurred overseas in France, Chile, China, Korea,

21   Japan.  This is where the counsel were too.  So these

22   are not easily findable joint counsel to subpoena

23   documents from.  That's why we asked for their

24   specific contact information.  And we never got that

25   information until post the depositions and we just

                                                      62

1    never got it.  Just we got a list of a handful of

2    names, and that's all we got.  But no way to know how

3    to get ahold of them.  Not even -- not even an

4    indication of which firms they were with, if they

5    were with a firm.

6        So then with regard to the discussion about the

7    rolling production, I told -- you know, Ms. Ray is

8    correct.  I informed her we would accommodate a

9    rolling production, but she needed to, quote,

10   identify the document that it was -- or document

11   request that the document was responding to.  I --

12   you know, that's what my response was.  I did not

13   anticipate nor did I authorize her to send me batches

14   of documents that were responsive to a half dozen

15   requests.  That is in -- that is not in compliance

16   with the rules.  That's not what is anticipated by

17   the rules.  That is not how you practice.  And it's

18   for good reasons.  It's impossible for us to then go

19   through that and figure out amongst a half dozen

20   different responses to requests which document is

21   responding to one or the other when in the response

22   itself there is no identification of any document

23   that is responsive to that request, zero, in every

24   response.

25        THE COURT:  Let me -- let me just interrupt you

1    there for a moment, Mr. Austin.

2         Ms. Ray, is that correct?  Do you agree that

3    the documents you provided were not designated by

4    specific requests for production?  Do you agree with

5    that?

6         MS. RAY:  Partially.  There was -- I identified

7    the document requests that they related to, but then

8    there were groups of documents that had a general

9    topic, and I identified that general topic for

10   Mr. Austin.  So there was some identification about

11   the requests that they related to and some -- some

12   identification as to the topic, because they would

13   have been, like, a bunch of interrogatory -- document

14   requests that they were responding to.  So, for

15   example, here are emails relating to the licensing

16   program.  That kind of thing.  They are more

17   topically identified.

18        THE COURT:  All right.  Back to you,

19   Mr. Austin, if you want to continue.

20        MR. AUSTIN:  Yeah, I will just respond to that

21   one quick question, and then if you want to go

22   through each request, we can do that.

23        THE COURT:  Yeah, why don't you response to

24   that topic.  Let's go through the requests or I can

25   try to narrow down each side's specific position on

1   this thing.

2       MR. AUSTIN:  I think it would be beneficial, as

3   I go through this, for the Court to understand what

4   we received and what we saw.  We would receive from

5   Ms. Ray, and initially we were getting -- there were

6   some emails were going to me and some were going to

7   Ms. Bruss.  We finally, just said, look.  You've got

8   to get them to both of us so we can see them.  And

9   she did.

10      But what we were seeing, and I've got all those

11  emails stored as a separate caption, but the email

12  would say something like this.  It would be "first

13  email regarding document production, five documents

14  regarding Morisky widget agreement."  So she would

15  send me a document.  I would go, okay.  That one is

16  going to be responsive to document five, widget

17  agreements, but then when I would get into it,

18  it's -- it's not -- it's not the list.  Document

19  Request No. 5 was a request for all of the

20  agreements, and I would find one or two agreements

21  and then a whole bunch of emails about that

22  agreement.  And I learned very quickly that these are

23  not documents that were comprehensive of all the

24  agreements.  These were documents that they had

25  addressed in their counterclaim and that they had not

65

1    produced prior to the deadline for their own

2    production of documents.  And so they were trying to

3    get them in through our requests for production in

4    support of their counterclaim or their affirmative

5    defenses.  And that's when it became very clear is

6    what was happening there.

7         So then I would get a document that was an

8    email back on the 16th of May, a day after the

9    deadline, and I got quite a batch of them on that

10   day.  But I -- you know, with regard to -- let's see.

11   Here's another one.  Response to production -- so

12   I've got a Daiichi attorney conference is the kind of

13   title, email 5RSP11, 12 docs.

14        Daiichi is one of the licensees, so I'm getting

15   kind of this vague reference to licensees, but then

16   I've got about 80 to 100 documents that flow out of

17   that that are supposedly applying to two different

18   categories or two different requests with no

19   delineation and no Bates numbering to identify them.

20   And this is just only in the email that is coming to

21   me.  It's not identified in the actual response to

22   the requests for production.

23        So if you go through each request for

24   production, their answer in every single case

25   predominantly is these documents have or will be

 1    produced.  And then there is no listing of the
 2    documents that have been produced or that will be
 3    produced.  And there is no -- even when they sent us
 4    a revised response, which I think they sent on the
 5    24th or 25th of May, ten days late, we did not still
 6    get an identification of any of the documents that
 7    have been produced or allegedly produced in response
 8    to those requests.  So there is no way for us to
 9    readily identify amongst the about 500 documents that
10    got rolled out to us which response they were
11    addressed to.
12        The work was put on us to go through those 500
13    documents.  And in some cases, I mean, literally I
14    will point to Request 5, right.  The Request 6,
15    Request 7, Request 21, all the documents that they
16    claim were responsive to those categories, some 400
17    documents, were part of one email of documents that
18    were attached that just said responsive to Requests
19    5, 6, 7, and 21.  That's improper.  That's not
20    responsive.  And there is no listing of the documents
21    by Bates number.
22        The rules are designed so that it is not the
23    job of the party that is doing the requesting to try
24    to divine what the producing party believes the
25    document responds to in the question.  That is their

                                                        67

1    job to specifically identify by request themselves

2    which document is responsive to those, which would be

3    very cumbersome for them to do because not one of

4    those documents is Bates numbered.  Many of them have

5    no numbering.  Many appear to have been cut and paste

6    from emails into Word documents.  Some were forwarded

7    and continued to have forwarding information that

8    may -- may be irrelevant, so they were in very bad

9    shape as far as evidence is concerned.  They were

10   going to incur enormous challenges to put somebody on

11   the stand and go through and delineate what this is

12   and whether or not it has been tampered with, because

13   there is clear evidence that it was cut and paste or

14   pieces of it were cut and paste and put into a Word

15   document.

16        And we also know, from having looked at these

17   documents, that they literally -- that the work was

18   done predominately, appears to us, by Mr. Trubow

19   himself, and he prepared these and assembled them as

20   a package and then forwarded them to his attorneys to

21   be produced.  We know that because the forwarding

22   email was included in some cases.

23        So that's the nature that we're trying to deal

24   with here.

25             THE COURT:  Okay.

1          MR. AUSTIN:  And it's impossible.  It's

2     impossible for us to clearly understand what is going

3     on.  And I can go through them in detail, but my

4     point is I just want to make it clear that there was

5     no grant of just a general category.  What she did

6     was not what I had requested.  I requested identify

7     the documents responsive to each request.  The

8     standard rule.

9          THE COURT:  Right.  All right.  Thank you,

10    Mr. Austin.

11         Ms. Ray, anything else you'd like to tell the

12    Court on how you and your client responded to the

13    requests for productions?

14         MS. RAY:  Well, I would like to add that I did

15    try to be as thorough as possible in getting

16    documents on every category that was requested, and I

17    sent them and identified the categories or the areas.

18    And as far as what was produced, I believe everything

19    was responded to and there is nothing more.

20         Organization-wise, I thought I was doing what

21    Mr. Austin had said.  And I hear now that he would

22    like to have more specificity into what the -- what

23    documents responded to what category.

24         THE COURT:  All right.

25         MS. RAY:  Yes.  That's my comment.

69

1          THE COURT:  Ms. Ray, do you believe that you

2     and your client responded to the requests for

3     productions in compliance with the rules of

4     discovery, in particular by designating which

5     documents connect with which requests for production?

6     Do you think you've done that?

7          MS. RAY:  I've done that for some of the

8     documents.  For others, I just added categories of

9     document areas, because I wanted to make sure we had

10    thoroughly covered those areas.  For example,

11    licensing-related documents.  I didn't want to leave

12    anything not produced.  And some -- as Mr. Austin

13    said, I would identify first the documents that

14    responded to categories under the federal rules, but

15    then I sent a lot more documents that were just

16    topically related.  Those things were not identified

17    by document request.  Those were just categories of

18    documents to make sure that everything was -- they

19    had everything.

20         I was really trying to get Mr. Austin documents

21    to use for his deposition.  And what he did in the

22    deposition was he took the documents and then

23    identified the categories and used them for

24    questioning, and I thought we were good.  So I'm kind

25    of surprised to hear that it didn't work for him,

1    because it seemed to work for him for the deposition.

2          THE COURT:  All right.  Mr. Austin, I will give

3    you a final response on this topic, then I want to

4    move on to the interrogatory requests.

5          MR. AUSTIN:  Sure.  Let me just give you a

6    sampling here of the documents that were absolutely

7    not responsive to anything.  An email that says

8    "Exhibit 11 Barclays Cancer Institute."  80 pages.

9          THE COURT:  What is your document -- what is

10   your docket?  Do you have a docket citation?

11         MR. AUSTIN:  No.  These were her production, so

12   she would send me an email.

13         THE COURT:  Oh, okay.

14         MR. AUSTIN:  And attached to it would be a

15   document entitled Exhibit 11 or Exhibit 12,

16   Exhibit 16, Exhibit -- or 94 exhibits, second-amended

17   counterclaim.  I mean, they literally gave us the

18   documents they had already produced in their

19   counterclaim with the exhibit numbers still attached

20   to the documents.  These were not responsive to our

21   questions.  These were documents they wanted to have

22   to utilize in their case because they didn't produce

23   them before discovery closed.  I mean, that's really

24   what this was.

25         So that's my -- that's kind of the affront

71

1    here.  So the majority of the documents come in this

2    fashion.  That's why I say they are not in a way

3    where they are responsive to my requests, and the

4    ones that purport to respond to our requests are

5    simply the same thing but only cherry-picking the

6    document they think would help bolster their case.

7    This was clearly produced by -- you know, put

8    together but Mr. Trubow with the mindset of how do I

9    get the stuff in that I want to win my case on

10   without really seeking anything that was responsive

11   to ours.

12        And just to go into kind of a little bit of the

13   detail on this, as we didn't go through granularly,

14   but the financial documents are critical in our case.

15   We asked for all of the financials.  We got -- we got

16   two tax returns and a single -- and one of the tax

17   returns is not complete.  It's a one-page cover.  And

18   only for the years '21 and '22, not for the range

19   that we requested the documentation for.  So we asked

20   for documents and -- that were regarding financials

21   and the response in both the interrogatories and in

22   the requests for production was we don't have them.

23   They are not in our possession, even though they

24   identify their banking institutions.

25        But that goes back to the laptop, because this

72

1   is where I came back in the deposition and asked

2   Mr. Trubow where -- you know, where are the documents

3   that would have all of the financials or all of the

4   license agreements?  And his response was, well, I

5   don't have them anymore.  And ultimately we were able

6   to draw out that what he meant by that was they were

7   on the laptop.

8       And I said, well, can you produce the laptop?

9   And initially, he said, well, the hard drive is

10  broken.  Well, can you produce it so we can check

11  that?  Well, you can't -- I don't have it.

12      I mean, it's -- I will tell you, the court

13  reporter kind of chuckled in the course of his

14  responses as the response became a little more of the

15  dog ate my homework as we went along, until he

16  finally said, well, no, it -- it broke and so I threw

17  it away, right after he was supposed to have appeared

18  and missed his deposition on that weekend.  So this

19  is where we're looking at this record.

20      So I go through, no financials we will produce.

21  That's Request No. 9 and 10.  We asked for all the

22  litigation documents that were -- all the complaints,

23  all the settlement agreements that were filed both

24  with Dr. Morisky and we suspected and we found on our

25  own complaints and settlement agreements that were

73

1    entered without Dr. Morisky, in express violation, we

2    believe, of the requirements of the settlement

3    agreement.  Those document requests go from -- are 5,

4    6, 7, and 8.  In all cases, the response was, we

5    don't have them.  They are with our joint counsel,

6    which were not identified and no contact information

7    was provided.

8         That is core to our case.  How do we show that

9    they violated the CR2A by entering into settlement

10   agreements, license agreements, and filing suits in

11   which we were required to be paid a percentage of

12   whatever return was obtained if we do not have any of

13   the documents or the vast majority of them?  All we

14   have are the settlement agreements or the lawsuits

15   that were problematic, and I there are about a

16   handful of those, because those we became aware of

17   and we raised objections to the terms because the

18   terms incorrectly stated that Dr. Morisky didn't own

19   his own IP.  That was what it was.  Those -- and

20   those are the documents we got, which we already knew

21   of because they were attached to their amended

22   complaint under the same document.  So that's -- I

23   mean, this is the kind of thing we're looking at.

24        We finally did get the code, but let me tell

25   you about that, because again, this is a copyright

1    case, and they were alleging we were infringing their

2    code.  So we asked for a production of the code.  We

3    initially got a document we could not open.

4    Eventually, we were able to get a document we could

5    open, but that did not happen until after the

6    depositions had commenced in late May.  And by which

7    time that code, which is -- I don't know how many

8    lines, but it's 500 pages if you print it out, or

9    more, there is no way for me to have had somebody

10   with proficiency in reading code to go through that

11   and help me prepare for a deposition.

12        And then when we got to the deposition of the

13   30(b)(6) witness, which was Mr. Trubow, in which one

14   of the topics was speak to what parts of the code are

15   your original material that has been inputted into --

16   put in and that is the subject of the copyright as

17   opposed to the material that is original to Dr.

18   Morisky so that we can see what is derivative and

19   transformative, because they were alleging in their

20   complaint that the code was transformative.  And

21   Dr. Morisky -- or Mr. Trubow responded he could not

22   speak to the code.  He cannot read the code.  He was

23   utterly unprepared and incapable of providing any

24   testimony as to that -- that request.  So that's a

25   whole other section we haven't gone into, but that's

75

1    part of our motion.  We did not have a 30(b)(6)
2    witness who could speak to all 14 topics.  We had one
3    who could speak to two or three of the 14.  And we
4    had provided the references in the deposition in
5    which Mr. Trubow frankly acknowledges, I can't speak
6    to that.  I can't speak to that.  I'm not prepared to
7    talk to that on all of those.
8         So this is what we're dealing with now.
9    Request No. 1, identify all of the documents
10    responsive to the interrogatory by interrogatory
11    number.  I can tell you from looking at all of the
12    emails that were sent to me, there were three emails
13    that identified an interrogatory, and the responses
14    were -- I got one that just said interrogatory
15    responses with no delineation at all of what response
16    it was responding to.  I got another one that said
17    response to Interrogatory 11, but then it -- it only
18    included Daiichi and Racia [phonetic], 2 of 100 plus
19    licensees that were the subject of legal actions.
20    That's what request 11 was to provide us documents
21    with response to.
22         And I got one -- I got another one for Rog 11
23    and I got a final email for rog -- for Interrogatory
24    Responses 5, 6, and 9.  So of the total of
25    interrogatory requests that we made, and there were

76

1    23, I think we got specifically identified four.

2    One, two, three, four.

3         THE COURT:  And when you say specifically

4    identified, that means that the information --

5         MR. AUSTIN:  At least were in the title of the

6    email that was sent to me, but no document was

7    identified.  It was just these documents are

8    generally responsive to Interrogatories 5, 6, and 9.

9         THE COURT:  Okay.

10        MR. AUSTIN:  Because the documents that are --

11   you know, it's the response to what was requested in

12   No. 1, these are the documents that are responsive to

13   Interrogatories 5, 6, and 9.  But when I get into

14   them, I realize they are utterly inadequate.  They

15   are not responsive and not complete.  And I have not

16   gone through every single one of these, but we have

17   gone -- I have through this.  It is painful and it is

18   extraordinarily time consuming.

19        But the bottom line is at day's end, we don't

20   have a production that meets the rules that is

21   usable.  I literally had to go myself and have my

22   team in the few hours that we had available the day

23   before the deposition and the day of the deposition

24   take some of their documents and Bates number them so

25   that I could create a comprehensible record on the

77

1    deposition.  But by no means did I -- you know, is

2    that comprehensive.  That's just what we could

3    quickly grab in the rush we could do when these

4    documents came in literally, you know, right before

5    we're going forward on the deposition.

6         So this is the frustration.  We're -- we've

7    been a year into this, and we still don't have the

8    critical documents that are at the core of our case.

9    What are the license agreements?  What are the

10   settlement agreements?  How much money was there?

11   Was Dr. Morisky a part of each of these agreements?

12   We have nothing comprehensive, no list, nothing of

13   that nature.  And we know it's much more than four or

14   five or six or seven of these arguments, because it's

15   listed as hundreds in the actual agreement that they

16   have licenses with.  So we don't have any financials

17   as a result of that either.  We don't have any

18   records.

19        Their response is we can't get them.  And yet

20   they can identify their own bank, but they are asking

21   us to go subpoena their bank after discovery is

22   closed when they finally are compelled to produce a

23   response to identify their bank.  Then they say, oh,

24   here's our bank, but we don't have the records

25   because we didn't go get them and now you can't

1          because discovery is closed.  Thanks, your Honor.

2                   THE COURT:  Thank you, Mr. Austin.

3                   Ms. Ray, what else would you like to tell the

4          Court regarding these requests for productions and

5          your client's response to discovery?

6                   MS. RAY:  Your Honor, thank you.  Yes, we

7          produced everything that we possibly could and

8          identified what I could according to interrogatories.

9          I thought we did a responsible job and identified the

10         responses to interrogatories.  But then, as I said, I

11         provided more.  And therein lies, I guess, the

12         problem.  I sent a lot of extra documents and

13         they're -- they're -- they are in topics rather than

14         identifying interrogatories.  That's -- I just threw

15         these other documents in in case Mr. Austin wanted to

16         use them in his deposition.  So there I guess is the

17         problem.

18                  I identified responsive documents by

19         interrogatory to the extent possible.  One of the

20         problems here is that many of the documents that they

21         are seeking for their case don't exist.  There is

22         very little on licensing and financial records, and a

23         lot of it is equally available to them by subpoena

24         through the third-party lawyers.  And so we're stuck

25         with in between.  We don't have any documents to

1    produce.

2         And they have questions about things that just

3    is part of their, quote, case, but they don't exist.

4    So there we are.  I -- we're in a position where we

5    can't produce anything related to a question they may

6    have and that doesn't mean we're not responsive.

7    It's just we don't have anything.  So thank you, your

8    Honor.

9         THE COURT:  All right.

10        MS. BRUSS:  Your Honor, may I cite to one part

11   of the record on this issue?  We submitted to the

12   Court where Mr. Trubow testified in his deposition

13   that one of his attorneys had given him a Dropbox

14   full of documents that was so large he didn't

15   download it.  He said, "When I asked him for the

16   stuff post CR2A, he gave me a Dropbox.  It had so

17   much stuff in it I just didn't have time to go

18   through it."

19        And then Mr. Austin says, "Have you produced

20   any of that information from the Dropbox in this

21   litigation?"

22        Answer:  "The Dropbox is expired.  I didn't

23   even download it.  It was so big."

24        This is at Document 155-8 and that is

25   Mr. Trubow's testimony.  So he did have documents.

1    He just didn't want to look at them and didn't bother

2    to turn them over and didn't tell us about them until

3    his deposition.  He also testified that he eventually

4    got bank statements from some of his banks that he

5    gave to his bookkeeper but never produced to us.

6         So this argument that they produced everything

7    they have is contradicted by Mr. Trubow's own

8    testimony under oath.

9         THE COURT:  All right.  Thank you, Counsel.

10   Let's move on to the final topic for today in this

11   hearing, which is we got a motion to stay and an

12   argument regarding the current scheduling order and

13   trial date.

14        On the plaintiff's side, Mr. Austin, can this

15   case proceed to trial on November 27th before Judge

16   Martinez?

17        You are on mute.

18        MS. BRUSS:  You are on mute, Chris.

19        MR. AUSTIN:  I'm going to pass the baton to my

20   colleague on this one, because she is the one that

21   was prepared to address this issue.

22        THE COURT:  Okay.  Go ahead, Ms. Bruss.

23        MS. BRUSS:  Thank you.  I feel like it's fairly

24   clear from everything we've discussed today, no,

25   because we don't have -- I mean, we've got a motion

81

1    in limine deadline of October 26th.  We don't have

2    documents, we don't have -- I mean, no, we don't.  If

3    the next step is going to be requiring us to

4    undertake the expense of sending subpoenas to

5    defendant's agents to obtain documents that he should

6    have produced, I don't know how long that's going to

7    take.  But no, we are not prepared to move forward

8    because we don't have the core evidence that we

9    should have.  We should have had a year ago.  So no.

10        THE COURT:  How about on behalf of the

11    defendants, Ms. Ray?

12        MS. RAY:  Actually, we've been preparing the

13    same time period and we're ready to go.  We're ready

14    for November 27th.

15        THE COURT:  Okay.  All right.  Now, possibly,

16    if you had a motion to stay, what else would you like

17    to tell the Court on that motion to stay, Ms. Bruss?

18    Are you -- you are asking for case dispositive

19    sanctions.  If the Court doesn't do that, then I'm

20    interpreting your argument as being that you want to

21    stay the case or continue the trial date; is that

22    what you're looking for?

23        MS. BRUSS:  Your Honor, at this point what we

24    would be seeking in the event the Court decided that

25    this case can somehow go forward, we are asking for

1    an extension of all of the deadlines by a substantial

2    amount of time so that we can reopen discovery.  We

3    don't believe that defendants should be able to

4    reopen discovery.  They've had ample opportunity.

5    But we will need to reopen to send out subpoenas,

6    apparently.

7         We would ask that the Court require defense to

8    pay for those, although I don't see that actually

9    being effective.  But if we're going to move forward,

10   we need additional time, so we would want to -- we

11   would ask the Court to extend the deadlines at least

12   six months for completion of discovery, further

13   depositions.  I believe we're going to need to depose

14   probably Mr. Mackey.  He seems to be the only one

15   that knows about source code on defense side.  So

16   conducting additional deposition, sending out

17   subpoenas, any further discovery that's resulting

18   from those and then motion practice after that.

19        In theory, a lot of this case could have been

20   dealt with on dispositive motions, but we couldn't

21   file a dispositive motion without documents and

22   without discovery.  So we would like an extension of

23   the dispositive motion deadline after the new

24   discovery deadline so that we can try to resolve this

25   case without spending a lot of the jury's time that

1    doesn't need to be spent.

2         THE COURT:  Understand that.

3         MR. AUSTIN:  Your Honor, just if I may, the

4    request for a stay was to stay the proceedings of the

5    case until the Court ruled on these motions that are

6    before you today.

7         THE COURT:  Yeah.  Okay.  Okay.  All right,

8    Counsel.  I think we've been through the topics for

9    today.  Is there anything on behalf of the plaintiff

10   you think you would like to address for the Court,

11   Mr. Austin, Ms. Bruss?

12        MR. AUSTIN:  I think we have covered much more

13   than I thought we might be doing today, so I don't

14   think there is anything more from us at this point to

15   bring to the Court's attention.

16        THE COURT:  All right.  How about you, Ms. Ray

17   or Mr. Harris, on behalf of the defendants?

18        MS. RAY:  I will go first.  Thank you, your

19   Honor.  Thank you for the Court spending the time on

20   these motions and making the Court's effort to

21   resolve the issues that we were kind of wondering and

22   wondering what the resolution would be and we

23   appreciate what you've done today.  Thank you very

24   much.

25        THE COURT:  All right.  Mr. Harris, anything?

84

1          MR. HARRIS:  Yes, Your Honor.  Just final word

2     for me, defense does request that if you do extend

3     the deadlines for plaintiffs that you also extend the

4     deadlines for defendants, as there was some other

5     discovery disputes that, you know, we would like to

6     engage in as well or at least hopefully not disputes

7     but some discovery that we were not able to complete.

8     And that's all.  Thank you for your time this

9     morning.

10         MS. BRUSS:  Your Honor, may I make one point.

11    To the extent the defendant's are asking for an

12    extension of discovery on their end, we would like

13    the opportunity to brief a response.

14         THE COURT:  Right.  The Court doesn't have a

15    request from the defendants that's been filed to

16    reopen discovery, so that's not even before the Court

17    at this time.

18         MR. HARRIS:  Yes, your Honor.  Ms. Bruss just

19    said that she requested that the Court extend

20    discovery for plaintiffs exclusively, so I was merely

21    responding to that statement.

22         THE COURT:  Yeah, and the plaintiffs have

23    actually filed a motion to that effect.  I think

24    that's included in what they submitted as an

25    alternative request, that they be given an

1      opportunity to conduct -- to reopen discovery, so

2      that actually is before the Court.

3          MR. HARRIS:  Understood, your Honor.

4          MS. RAY:  Your Honor, we would like the

5      opportunity to file a motion to extend discovery as

6      well if -- if there is an extension of time for

7      discovery for the plaintiffs, we would like the

8      opportunity to move equally for time.

9          THE COURT:  Court's not going to make a ruling

10     on that, Ms. Ray, at this point.  You know, you are

11     always free to file whatever motions you think are

12     appropriate.  The Court would consider any motions at

13     the time that you get them filed and they are ready

14     for the Court's consideration.

15         MS. RAY:  Thank you, your Honor.

16         THE COURT:  With that, Counsel, thank you for

17     your arguments this afternoon.  The Court is in

18     recess.  Thank you.

19        (Court adjourned.)

20

21

22

23

24

25

86

<pre>
 1                    C E R T I F I C A T E

 2

 3      STATE OF WASHINGTON  )
                             ) ss
 4      COUNTY OF LEWIS      )

 5

 6          I, JESSICA L. TURNER, Certified Court Reporter

 7      for the State of Washington, do hereby certify:

 8          That the foregoing verbatim report of

 9      proceedings consisting of 86 pages was reported by me

10      and reduced to typewriting by means of computer-aided

11      transcription;

12          That said transcript is a full, true, and

13      correct transcript of my shorthand notes of the

14      proceedings heard via Zoom videoconference before

15      Hon. David W. Christel on October 19, 2023, for the

16      U.S. District Court, Western District of Washington;

17          That I am not a relative or employee of counsel

18      or to either of the parties herein or otherwise

19      interested in said proceedings.

20          Signed this 22nd day of May, 2024.

21

22

23      _____
        Jessica L. Turner
24      CCR No. 3187

25

                                                           87
</pre>