# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **MMAS RESEARCH LLC,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 24-cv-12108-DJC** |
| | ) | |
| **THE CHILDREN'S HOSPITAL** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, C.J.**                                                 **December 3, 2025**

## I.    Introduction

Plaintiff MMAS Research LLC ("MMAS") has filed this lawsuit against Defendants The Children's Hospital Corporation ("Boston Children's Hospital" or "BCH"), Jacob Hartz ("Dr. Hartz") and Hannah Palfrey ("Palfrey") (collectively, the "BCH Defendants"), Donald Morisky ("Dr. Morisky") and Morisky Medication Adherence Research LLC ("MMAR") (collectively, the "Morisky Defendants") and Does 1 through 10 (the "Doe Defendants") (collectively, "Defendants") alleging claims against the Morisky Defendants as to a violation of the Digital Millenium Copyright Act ("DMCA") (Count III) and tortious interference with contractual relations (Count IV).  D. 24.  The Court allowed the BCH Defendants' motion to dismiss in part, D. 25, and dismissed Count I (breach of contract claim) as to Dr. Hartz and Palfrey and Counts II (violation of the DMCA) and V (violation of the Defend Trade Secrets Act) as to the BCH Defendants.  D. 64.  The Morisky Defendants have now moved to dismiss MMAS's claims against

1

them (Counts III and IV) for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), D. 54. For the reasons discussed below, the Court DENIES the Morisky Defendants' motion to dismiss, D. 54.

## II. Standards of Review

In ruling on a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) without an evidentiary hearing, a district court must apply the prima facie standard of review. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). "Under this standard, it is [the] plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." Id. (quoting United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 44 (1st Cir. 1993)). The Court considers the facts alleged in the pleadings as well as the parties' supplemental filings. Sawtelle v. Farrell, 70 F.3d 1381, 1385 (1st Cir. 1995); Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994). The Court will "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law at Andover, Inc. v. A.B.A., 142 F.3d 26, 34 (1st Cir. 1998) (citing Ticketmaster-N.Y., Inc., 26 F.3d at 203). In doing so, the Court will "not credit conclusory allegations or draw farfetched inferences." Ticketmaster-N.Y., Inc., 26 F.3d at 203. The Court is also required to "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Mass. Sch. of Law at Andover, Inc., 142 F.3d at 34.

## III. Factual Background

The following facts are drawn from MMAS's amended complaint, D. 24, Philip Morisky's sworn declaration in support of Defendants' motion to dismiss, D. 54-1, and the exhibits in support

of MMAS's opposition, D. 63-1; D. 63-2.  The facts are accepted as true for the purposes of resolving the motion to dismiss.

      *1.*     *Dr. Morisky, the Morisky Medication Adherence Scale (MMAS-8) and the Morisky Widget*

Dr. Morisky is an Emeritus UCLA professor of public health and a renowned expert on identifying and remediating life-threatening risks associated with patients' failure to comply with medication protocols.  D. 54-1 ¶¶ 4, 7.  Dr. Morisky retired in 2017 and currently resides in Las Vegas, Nevada.  Id. ¶ 4.  Philip Morisky, Dr. Morisky's son, is the CEO of MMAR, a Nevada limited liability company, operated from Nevada and remotely from his residence in California. Id. ¶¶ 1, 4.

In 1986, Dr. Morisky developed the "Morisky Medical Adherence Scale" ("MMAS"), a four-part questionnaire to effectively predict medical adherence also known as the "MMAS-4." Id. ¶ 8.  Dr. Morisky later developed an eight-part questionnaire ("MMAS-8") known as the Morisky Scales.  Id. ¶ 9.

MMAS is a Washington limited liability company which conducts business in Boston, Massachusetts.  D. 24 ¶¶ 7, 22.  MMAS was co-owned by Steven Trubow ("Trubow"), the current Chief Executive Officer, and Dr. Morisky, from January 2017 to July 2019.  Id. ¶¶ 1, 3.  Between November 2016 and February 2017, Trubow, Dr. Morisky and Dustin Machi ("Machi") collaborated to create the Morisky Widget MMAS-8 and the MMAS-4 software.  Id. ¶ 23.  As alleged, MMAS owns the "MMAS REASEARCH WIDGET CODE" (the "Morisky Widget MMAS-8" or the "Morisky Widget"), a digital diagnostic assessment protocol to measure and identify medication nonadherence behaviors that allows doctors and healthcare providers to assess whether patients are taking their medications as prescribed.  Id. ¶¶ 1-2; see id. ¶ 56.  Whereas the MMAS-8 is comprised of eight static questions and is "a measure of medication adherence," the

Morisky Widget is "dynamic with constantly changing MMAS-8 questions that are condition and medication specific."  D. 24 ¶¶ 54, 56.

MMAS registered the Morisky Widget with the U.S. Copyright Office and obtained a certificate of registration that comprised of the Morisky Widget diagnostic assessments, the MMAS-4, MMAS-8 and other diagnostic assessments.  Id. ¶¶ 30-31; D. 24-1 at 47.  MMAS alleges it has been and continues to be the author and exclusive holder of all rights, title, interest in, and copyright to the Morisky Widget.  D. 24 ¶ 33.  Between February 2017 and July 2019, MMAS licensed the Morisky Widget software to over 200 pharmaceutical companies and firms, universities and hospitals.  Id. ¶¶ 3, 25.  On July 29, 2018, Dr. Morisky responded to Dr. Hartz's request for an MMAS-8 license for BCH and authorized Trubow to assist Dr. Hartz in obtaining the license.  Id. ¶¶ 45, 47, 139(b); see D. 24-1 at 107-09.  On September 4, 2019, BCH executed a perpetual Morisky Widget license with MMAS.  D. 24 ¶ 42; see D. 24-1 at 58-62.  The BCH MMAS Morisky Widget License specified that Licensee BCH could use the Morisky Widget, Morisky Kiosk Apple I Phone APP, and the Morisky API to administer Morisky Widget MMAS tests.  D. 24 ¶ 43.

### 2.    Dr. Morisky's Departure from MMAS and Founding of MMAR

In 2019, Dr. Morisky founded Morisky Medication Adherence Research LLC ("MMAR"), a company in Nevada which developed a medication adherence software similar to the Morisky Widget.  Id. ¶¶ 4, 26.  In July 2019, Dr. Morisky voluntarily left MMAS and relinquished his fifty percent interest in the company, the Morisky Widget software, and Morisky Widget website. Id. ¶¶ 27-28.  Trubow remained as the sole owner of MMAS and the sole manager and licensor of the over two hundred Morisky Widget license agreements.  Id. ¶ 27.

As alleged, in December 2020, Dr. Morisky and Trubow signed a preliminary settlement agreement ("CR2A") in which the parties agreed to dismiss the claims asserted against each other

4

in ongoing litigation in Washington State and Nevada.  Id. ¶¶ 29, 139; see D. 24-1 at 13-25; see also D. 63-2 at 2-4.  Philip Morisky also signed the CR2A, in an individual capacity and as managing member of MMAR.  D. 24-1 at 24.  The CR2A included a list of the two hundred Morisky Widget licenses, including BCH.  See D. 24 ¶¶ 70, 75, 139; see also D. 24-1 at 41-45; D. 63-2 at 5.  Pursuant to the CR2A, the "Morisky Party," including Dr. Morisky and Philip Morisky, and MMAR agreed "to provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect."  D. 63-2 at 3; D. 24 ¶ 71.  MMAS alleges the agreement was "meant to protect [MMAS] from Morisky interfering with existing Morisky Widget licenses," including the perpetual Morisky Widget license between MMAS and BCH that Dr. Morisky had authorized in 2018 and executed in 2019.  D. 24 ¶¶ 45, 47, 139.

MMAS alleges Dr. Morisky attempted to undermine MMAS "by interfering with existing licenses and falsely claiming ownership of the Morisky Widget's copyright."  Id. ¶ 4.  A post on Dr. Morisky's website, dated October 30, 2021, noted that Dr. Morisky had phased-out the Morisky Widget and that MMAR was "transitioning all Morisky Widget users who request it a new upgraded HIPAA and GDPR compliant digital format – the MMAR digital platform – within the next 45 days."  Id. ¶ 72; D. 24-1 at 65.  The post also noted that "[y]ou may receive an email from Philip Morisky, CEO of MMAR LLC, if you would like to commence the process" and that "[t]he Morisky Party and MMAR agrees to provide full access to the Morisky Widget and support as needed to all licenses [sic] as long as their licenses to the Morisky Widget are in effect."  D. 24-1 at 65.

MMAS also alleges the "interference included sending threatening legal notices to MMAS's licensees and BCH, which caused confusion and harm to MMAS's business relationships."  D. 24 ¶¶ 4, 75.  In a letter dated April 21, 2022 (the "Austin Letter"), Dr. Morisky's

counsel stated Trubow and MMAS did not have authority to use or license the MMAS-4 scale, the MMAS-8 scale or the Morisky Widget and that persons using or licensing the same without Dr. Morisky's express written authorization would be in violation of U.S. federal copyright and trademark laws.  Id. ¶ 75; D. 63-1 at 1.  This letter came in the midst of what remains ongoing litigation between Dr. Morisky, MMAS, Trubow and others, regarding copyright infringement, trademark infringement and breach of contract claims.  Morisky v. MMAS Research, LLC, No. 21-cv-01301-RSM (W.D. Wash. 2021).  The letter was published on Dr. Morisky's website and emailed to Morisky Widget licensees, including BCH.  D. 24 ¶¶ 75, 77, 79; D. 24-1 at 67-69.  A May 21, 2022 post on Dr. Morisky's website stated that "[a]ny use by anyone of the Widget must immediately contact us to transfer their services to the MMAR platform, or they will be subject to potential copyright and trademark infringement actions against them."  D. 24-1 at 68.

Philip Morisky attests that in late 2022, he learned that BCH was conducting a study using the Morisky Scales to assess adherence level in adolescents with a prescribed statin drug and to determine the efficacy of a monetary incentive on medication adherence.  D. 54-1 ¶ 11.  He further attests that "[a]fter confirming that no license had been granted to [BCH] for such a study, [he] contacted Dr. Jacob Hartz who was identified as the person at the Hospital overseeing the study."  Id.  Dr. Hartz confirmed to Philip Morisky that BCH intended to use the MMAS-8 for the study and that it did not have a license from Dr. Morisky.  Id. ¶ 12.  During fall 2022, Philip Morisky sent an email containing a permission letter to BCH licensing it to use the MMAS-8 without charge in connection with the study it was conducting.  D. 54-1 ¶¶ 5.  The permission letter also authorized and provided that BCH attribute to Dr. Morisky the license for use of the MMAS-8 in BCH's report on the study.  Id. ¶ 12.

6

On January 10, 2023, Dr. Hartz removed the MMAS notification from ClinicalTrials.gov without MMAS's permission, D. 24 ¶ 95, and updated the website again on January 24, 2024 noting a license for the MMAS-8 was available from MMAR, id. ¶¶ 97-98.

## IV.    Procedural History

MMAS instituted this action on August 15, 2024.  D. 1.  On October 21, 2024, MMAS filed an amended complaint.  D. 24.  The Morisky Defendants have now moved to dismiss the claims against them, Counts III and IV, of the amended complaint.  D. 54.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 76.

## V.    Discussion

To exercise personal jurisdiction over a defendant, the Court must "find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process clause."  Sawtelle, 70 F.3d at 1387; see Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015).  Unlike other states' long-arm statutes, "the Massachusetts statute does not purport to extend jurisdiction as far as due process would allow."  SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 328 (2017).  Accordingly, the Court generally assesses its jurisdiction under the long-arm statute before proceeding to due process analysis.  Id. at 330.

### A.    Massachusetts's Long-Arm Statute

The Massachusetts long-arm statute, Mass. Gen. L. c. 223A, § 3, "enumerates eight grounds on which a nonresident defendant may be subjected to personal jurisdiction by a court of the Commonwealth."  SCVNGR, 478 Mass. at 328 (citing Mass. Gen. L. c. 223A, § 3).  Neither the Morisky Defendants nor MMAS address the relevant provisions of the Massachusetts long-arm statute and rest their arguments solely on the constitutional analysis.  See D. 54 at 6 (urging by the Morisky Defendants that "it is appropriate in this case to sidestep the statutory inquiry and

proceed directly to the constitutional analysis," citing prior law) (internal citation omitted); D. 63 at 4 (same).

Pursuant to provision 3(a) of Massachusetts's long-arm statute, which seems most relevant here, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth[.]" Mass. Gen. L. c. 223A § 3(a). "[F]or jurisdiction to exist pursuant to § 3(a), therefore, the facts must satisfy two requirements: 1) the defendant must have transacted business in Massachusetts, and 2) the plaintiff's claim must have arisen from the defendant's transaction of such business." Sigros v. Walt Disney World Co., 129 F. Supp. 2d 56, 63 (D. Mass. 2001) (citing Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994)).

The "transacting business" clause of c. 223A, § 3(a) is construed "broadly." Shipley Co., Inc. v. Clark, 728 F. Supp. 818, 821 (D. Mass. 1990) (citing Nova Biomedical Corp. v. Moller, 629 F.2d 190, 193-94 (1st Cir. 1980)). A defendant's "physical presence is not required to satisfy § 3(a)." Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 933 (1st Cir. 1985). Rather, the touchstone is "whether the defendant attempted to participate in the [C]ommonwealth's economic life." United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992). "[A]nything but the most incidental commercial contact is sufficient." Cannonball Fund, Ltd. v. Dutchess Cap. Mgmt., LLC, 84 Mass. App. Ct. 75, 98 (2013) (internal citation and quotation marks omitted). "This standard is not especially rigorous" and may be satisfied by mere "transitory contact with the forum." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 n.3 (1st Cir. 2016) (internal citation and quotation marks omitted). Finally, a "but for" test applies for determining when an injury "arises" from transacting business in Massachusetts. Sigros, 129 F. Supp. 2d at 65 (citing Tatro, 416 Mass. at 770-71). The relevant inquiry is "whether the defendant's contacts with the Commonwealth constitute the 'first

8

step in a train of events' that results in injury to the plaintiff." Zamzam Telecard, Inc. v. N.J.'s Best Phonecards, 514 F. Supp. 2d 136, 138 (D. Mass. 2007) (quoting Tatro, 416 Mass. at 770).

"For policy reasons, most jurisdictions have held that cease-and-desist letters . . . absent additional purposeful acts directed to the contested forum, are inadequate to establish jurisdiction." Tuteur v. Crosley-Corcoran, 961 F. Supp. 2d 333, 338 (D. Mass. 2013) (collecting cases).  In Nova Biomedical Corp., in which the First Circuit "analyz[ed] cease-and-desist letters through the lens of personal jurisdiction," held that "the sending of a patent infringement letter threatening suit 'can, in certain circumstances, constitute the transaction of business within the meaning of the Massachusetts' long arm statute' but '[w]hether a patentee is thereafter subject to jurisdiction will depend on whether he possesses sufficient contacts with the forum to satisfy due process.'"  Id. (quoting Nova Biomedical Corp., 629 F.2d at 197); see Nova Biomedical Corp., 629 F.2d at 195 (noting that the Court "need not, and indeed should not, attempt to identify all the circumstances in which the sending of [a letter charging patent infringement and threatening legal action] will constitute the transaction of business within the meaning of section 3(a)" and concluding the statutory requirement was met "(1) where the defendant already is conducting or planning some patent-related business activity in the forum, whether directly, by engaging in the manufacture or sale of products, or indirectly, by receiving royalties from a licensee who is so engaged, and (2) where the plaintiff is pursuing a competing line of work there").

The Morisky Defendants, through counsel, sent the Austin Letter to MMAS Widget licensees, including BCH.  D. 24 ¶¶ 75, 77.  Although the Austin Letter did not explicitly demand that licensees "cease and desist" from infringement, the letter nonetheless made clear that "[a]ny person that uses or licenses the Morisky Widget, MMAS-4 Scale or MMAS-8 scale without express written authorization of Dr. Morisky will be in violation of U.S. federal copyright law for copyright infringement" and "[a]ny person that uses any of [Dr. Morisky's] marks without the

express written authorization of Dr. Morisky will be in violation of U.S. federal trademark law." D. 63-1 at 3 (emphasis omitted); see Nova Biomedical Corp., 629 F.2d at 195 (noting that "[t]he mailing of a letter charging patent infringement and threatening litigation is clearly a 'purposeful' act by the defendant[,] and [a]lthough such an action, by itself, represents but an isolated and transitory contact with the forum, that is all the statute requires").

Although a cease-and-desist letter alone may be insufficient to establish personal jurisdiction in Massachusetts, the Morisky Defendants' additional contacts with the forum are purposeful acts that "add[] the element of 'more' to the equation." Tuteur, 961 F. Supp. 2d at 339. The record here establishes that the Austin Letter was not sent into the forum in isolation or absent prior contacts between Dr. Morisky and BCH. Dr. Morisky had initially negotiated and authorized the Morisky Widget license between MMAS and BCH with the understanding that BCH was in Massachusetts and MMAS would travel to BCH to conduct clinician training and certification. D. 24-1 at 107; see Bain v. McGriff Ins. Servs., LLC, 772 F. Supp. 3d 213, 222 (D. Mass. 2025) (noting that the Massachusetts long-arm statute's "reference to 'transacting any business' is 'general and applies to any purposeful acts by an individual, whether personal, private, or commercial'" and concluding the Court had jurisdiction under the Massachusetts long-arm statute where "causes of action ar[ose] from an insurance policy after a telephone call and two insurance proposals were transmitted by [defendant] to [p]laintiffs while they were in Massachusetts") (quoting Ross v. Ross, 371 Mass. 439, 441 (1976)). Although it does not appear that Dr. Morisky executed BCH's perpetual Morisky Widget license in 2019, see D. 24 ¶¶ 46-49; D. 24-1 at 58-62, the record suggests that, at least as of December 2020, Dr. Morisky and Philip Morisky were both aware that BCH and MMAS had ultimately executed a license because BCH was listed as a Morisky Widget licensee in the CR2A. See D. 63-2 at 5. As parties and signatories to that agreement, see D. 63-2 at 2, 4; D. 24-1 at 23-24, Dr. Morisky and Philip Morisky agreed "to

provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect."  D. 63-2 at 3; D. 24 ¶ 71.  However, in fall 2022, after the Austin Letter was sent to BCH in April 2022, Philip Morisky, as CEO of MMAR, "contacted Dr. Jacob Hartz who was identified as the person at the Hospital overseeing the study" and upon confirming BCH did not have a license from Dr. Morisky he emailed "a permission letter licensing the Hospital to use the MMAS-8 without charge for the study, which also authorized and provided that the Hospital attribute to Dr. Morisky the license for the use of the registered MMAS-8 in its report on the study."  D. 54-1 ¶¶ 11-12; see D. 24 ¶ 139; see also Tatro, 416 Mass. at 767 (noting that "generally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy [the § 3(a)] requirement").  Philip Morisky's actions on behalf of MMAR and in advancement of Dr. Morisky's interests "can reasonably be considered an attempt 'to reduce competition and thereby improve [the Morisky Defendant's] marketing and economic position.'"  See Nova Biomedical Corp., 629 F.2d at 195 (quoting B & J Manuf. Co. v. Solar Indus., Inc., 483 F.2d 594, 598 (8th Cir. 1973)).

The "but-for" standard is also met where, as here, MMAS's claims of tortious interference with contractual relations and violation of the DMCA arise from the Morisky Defendants' contacts with the Commonwealth.  The basis of MMAS's claims is that the Morisky Defendants knew BCH was located in Massachusetts and a Morisky Widget licensee, knew about their obligations under the CR2A and sent the Austin Letter to BCH, which prompted BCH to get a license from MMAR and alter its public attribution and the copyright management information ("CMI") in the BCH Clinical Trials Report.  See D. 24 ¶¶75-77, 79, 95-96, 133-134, 139-142; see D. 63 at 6-7.  As alleged, the Morisky Defendants' interference with the Morisky Widget license contact between MMAS and BCH, which induced BCH to alter the CMI, "terminated the contractual relationship between [MMAS] and BCH, and it misrepresented the Morisky Widget copyright ownership rights

in the public domain, thereby causing confusion and damage to [MMAS's] reputation and contractual rights."  D. 24 ¶¶ 139(b), 140.  According to BCH, the Austin Letter "assert[ed] that Dr. Morisky owned the Widget copyright and implicitly threat[ed] legal action against anyone who delt with Trubow. This was a source of 'confusion for Morisky Widget licensees,' [] evidently including the Hospital."  D. 24 ¶ 77 (internal citations omitted).  The Morisky Defendants' contacts were among the "train of events" that resulted in alleged injury and emanated from the replacement license upon which the claims are based.  Tatro, 416 Mass. at 770.  Accordingly, jurisdiction over the Morisky Defendants under Section 3(a) of the Massachusetts long-arm statute is proper.

At the motion hearing, the Morisky Defendants' counsel belatedly argued that the Austin Letter, a communication regarding active litigation sent to third parties that have a potential interest in the litigation, is protected by the Massachusetts litigation privilege and cannot be relied upon to form the basis for personal jurisdiction.  The Court allowed the parties to file supplemental briefs pointing to case law regarding the application of the litigation privilege and copyright enforcement privilege as to third parties and for the purposes of personal jurisdiction.  See D. 77; D. 80.[1]  The Morisky Defendants argue in their supplemental brief that the Austin Letter is immune from tort liability under the Massachusetts litigation privilege, which prevents plaintiffs from using the content of statements made "in the institution or conduct of litigation or in [conferences and other] communications preliminary to litigation" to establish liability against the party that made the statement.  D. 77 at 2-3 (quoting Larson v. Perry, No. 19-cv-10203-IT, 2020 WL 1495883, at *6 (D. Mass. Mar. 27, 2020)).  Even assuming *arguendo* that the Morisky Defendants' argument was timely, this argument is unsuccessful.  The cases cited by the Morisky Defendants do not address the application of litigation privilege in the context of establishing personal jurisdiction.  See id.

---

[1] To the extent that the Morisky Defendants sought leave to file this supplemental memorandum, D. 77, the Court ALLOWS this motion *nunc pro tunc.*

at 3 nn.15-17.  In fact, in <u>Larson</u>, a defamation case the Morisky Defendants rely upon, a different session of this Court considered a letter sent by defendants' counsel in concluding that the exercise of personal jurisdiction was appropriate.  <u>Larson</u>, 2020 WL 1495883, at *4-6.  In that case, the Court then addressed litigation privilege in the context of a Rule 12(b)(6) motion.  <u>Id.</u> at 7.  The Court denied the defendants' motion to dismiss for failure to state a claim on the basis of litigation privilege because the litigation privilege defense involved "questions of fact that cannot be resolved at this stage."  <u>Id.</u>

The Morisky Defendants also assert in their supplemental brief that the Austin Letter is "independently immune under the federal counterpart to the litigation privilege, the <u>Noerr-Pennington</u> Doctrine."  D. 77 at 3.  As the Morisky Defendants did not invoke this doctrine in their motion papers or at the motion hearing, and were not granted leave to address this argument in the supplemental brief, it is waived.  <u>See</u> <u>Acevedo-Garcia v. Monroig</u>, 351 F.3d 547, 568 n.8 (1st Cir. 2003) (noting that "arguments raised for the first time on reply are deemed waived").  In any event, none of the cases the Morisky Defendants rely upon with respect to the <u>Noerr-Pennington</u> doctrine are in the context of the court determining whether the exercise personal jurisdiction comports with the long-arm statute and due process, <u>see</u> D. 77 at 3-4 nn. 15-28, and to the extent that it can be invoked as to the merits of the claims, this is not the juncture for such determination.

For the reasons aforementioned, the Court concludes jurisdiction over the Morisky Defendants is proper under Section 3(a) of the Massachusetts long-arm statute.

## B.  <u>Due Process Requirements</u>

"For jurisdiction to be proper, constitutional requirements of due process must be met." <u>Shipley Co.</u>, 728 F. Supp. at 822; <u>see</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 471-72 (1985) (quoting <u>Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement</u>, 326 U.S. 310, 319 (1945)).  For a court to assert personal jurisdiction over a nonresident defendant,

constitutional due process demands that the defendant have "minimum contacts" with the forum

state, meaning that the defendant must "possess[] sufficient contacts with the forum state so that

subjecting him, her, or it to the forum's jurisdiction does not offend 'traditional notions of fair play

and substantial justice.'" United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1087 (quoting

Int'l Shoe Co., 326 U.S. at 316).

There are two types of personal jurisdiction to consider in the constitutional analysis:

general and specific. Cossaboon v. Me. Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010) (citing Harlow

v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005)). Given that MMAS does not assert general

jurisdiction and "does not dispute that these facts preclude general jurisdiction over the Morisky

Defendants in Massachusetts," D. 63 at 5-6, the Court's analysis focuses on whether the three

requirements for specific jurisdiction are met here: relatedness, purposeful availment and

reasonableness. PREP Tours, Inc. v. Am. Youth Soccer Org., 913 F.3d 11, 17 (1st Cir. 2019).

The Court must find that all three elements are present to assert specific jurisdiction over a

defendant, see Harlow, 432 F.3d at 57, and the plaintiff bears the burden of proof on all three

elements, see Rodriguez v. Samsung Elecs. Co., 827 F. Supp. 2d 47, 50 (D. Mass. 2011).

*1.    Relatedness*

The relatedness inquiry focuses on whether "the claim underlying the litigation . . . directly

arise[s] out of, or relate[s] to, the defendant's forum-state activities." Astro-Med, Inc. v. Nihon

Kohden Am., Inc., 591 F.3d 1, 9 (1st Cir. 2009) (alterations in original) (quoting N. Laminate

Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005)). This is a "flexible, relaxed standard," id.

(quoting N. Laminate Sales, Inc., 403 F.3d at 25), but still requires a causal relationship between

MMAS's claims and the Morisky Defendants' forum-related conduct, Harlow, 432 F.3d at 61.

Although not precisely proximate cause, "due process demands something like a 'proximate cause'

nexus." Harlow, 432 F.3d at 61 (quoting Cambridge Literary Props. Ltd. v. W. Goebel

Porzellanfabrik G.m.b.H. & Co. Kg., 295 F.3d 59, 65 (1st Cir. 2002)).  The critical element for this inquiry is whether a defendant can reasonably anticipate that their conduct would subject them to the forum state jurisdiction for a particular claim.  See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 715 (1st Cir. 1996) (stating that "[a]dherence to a proximate cause standard is likely to enable defendants better to anticipate which conduct might subject them to a state's jurisdiction than a more tenuous link in the chain of causation").

MMAS argues that its claims of tortious interference with contractual relations and violation of the DMCA arise from the Morisky Defendants' conduct aimed at Massachusetts.  D. 63 at 6-7.  MMAS specifically contends that counsel for Dr. Morisky sent the Austin Letter to BCH, which they knew was in Massachusetts, "asserting that any use of the MMAS-8 without Dr. Morisky's authorization would violate federal copyright law" and with an intent to influence BCH's conduct within the Commonwealth.  Id.; D. 24 ¶¶ 75-79.  MMAS also argues that the Morisky Defendants "inserted themselves into [MMAS's] contractual relationships with Massachusetts-based licensees and caused foreseeable injury in Massachusetts" because the Austin letter induced BCH to alter its public attribution to MMAS in its clinical trials report and to obtain a replacement license from MMAR.  D. 63 at 6-7; see D. 24 ¶¶ 95-99, 105, 133-134.  The Morisky Defendants contend that MMAS's claims do not arise from MMAR's provision of a free license to BCH and that they are entitled to enforce their copyrights.  See D. 54 at 8-9.

Here, the relatedness element is satisfied because MMAS's claims against the Morisky Defendants are based on the Austin Letter directed into Massachusetts to BCH.  During the motion hearing and in their supplemental brief, see D. 77 at 1, counsel for the Morisky Defendants noted that he sent the Austin Letter acting on behalf of Dr. Morisky and MMAR.  The record also indicates that Philip Morisky, on behalf of MMAR, contacted Dr. Hartz to inquire about BCH's study and use of the Morisky Scales and emailed Dr. Hartz a "permission letter licensing the

Hospital." D. 54-1 ¶¶ 11-12. As this Court has repeatedly held, "[t]he transmission of information into Massachusetts by way of the mails, the internet, or the telephone is decidedly a contact for purposes [of] the relatedness analysis." Lawrence v. Next Ins., Inc., 774 F. Supp. 3d 237, 252 (D. Mass. 2025) (quoting LaVallee v. Parrot-Ice Drink Prods. of Am., Inc., 193 F. Supp. 2d 296, 303 (D. Mass. 2002)); see Trans Nat'l Travel, Inc. v. Sun Pac. Int'l, Inc., 10 F. Supp. 2d 79, 83 (D. Mass. 1998) (concluding there was personal jurisdiction over executive defendant based only on "telephone calls, letters, and facsimiles" sent on behalf of the co-defendant company). While Dr. Morisky and Philip Morisky, CEO of MMAR, reside in Nevada and California respectively, they "need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." Astro-Med, 591 F.3d 1 at 10 (quoting N. Laminate Sales, Inc., 403 F.3d at 25). The Morisky Defendants' contacts with the forum through the Austin Letter, communications and the provision of an MMAR license for the Morisky Scales are both material to and the proximate cause of MMAS's claims for tortious interference of its contractual relationship with BCH and violation of the DMCA. See D. 24 ¶¶ 75-79, 95-99, 105, 133-134.

Accordingly, the Court concludes the relatedness element is satisfied.

### 2. *Purposeful Availment*

"The purposeful availment requirement ensures that jurisdiction is not premised on 'random, isolated, or fortuitous' contacts with the forum state." Weinberg v. Grand Circle Travel, LLC, 891 F. Supp. 2d 228, 245 (D. Mass. 2012) (citing Sawtelle, 70 F.3d at 1391). The inquiry into purposeful availment focuses on acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). "[T]he Supreme Court has explained that 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into

court there.'" Knox v. MetalForming, Inc., 914 F.3d 685, 691 (1st Cir. 2019) (quoting PREP Tours, Inc., 913 F.3d at 20). "Voluntariness" is also a cornerstone of the purposeful availment inquiry. See C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 66 (1st Cir. 2014); see also Noonan v. Winston Co., 135 F.3d 85, 91 n.4 (1st Cir. 1998) (noting that for the purpose of the jurisdictional inquiry, plaintiff must only show that the defendant "intentionally directed an act, tortious or otherwise, toward the forum state" and "[t]he defendant['s] lack of specific intent to harm [the plaintiff] is irrelevant").

The Morisky Defendants' counsel argued at the motion hearing that the Austin Letter and Philip Morisky's email communications are protected by the copyright enforcement privilege because a copyright holder has a right to provide notice and enforce their copyrights and that alone does not subject the copyright holder to jurisdiction. See D. 54 at 9-10. The Morisky Defendants' reliance upon cases that involved no more than notice of copyright are distinguishable. See D. 54 at 9; Combat Zone v. Does 1-84, No. 12-cv-30085-MAP, 2013 WL 1092132, at *8 (D. Mass. Feb. 20, 2013); Red Wing Shoe Co. v. Hockerson-Halberstadt, 148 F.3d 1355, 1360 (Fed. Cir. 1998). Although "copyright holders have a right to enforce their copyrights[,]" Combat Zone, 2013 WL 1092132, at *8, that does not suggest that a defendant enforcing their copyrights in a foreign forum is exempt from being subject to that court's jurisdiction. See GSI Lumonics, Inc. v. BioDiscovery, Inc., 112 F. Supp. 2d 99, 110 (D. Mass. 2000) (noting that an infringement letter into a forum may constitute transaction of business under the long-arm statute and alone is not enough to satisfy due process but finding that due process was met where a defendant engaged in licensing and distribution agreements in Massachusetts).

Red Wing Shoe Co., a case cited by the Morisky Defendants, illustrate the distinction from the facts alleged here. That case involved an action for declaratory judgment of noninfringement, invalidity and unenforceability of a patent where the Federal Circuit stated that "cease-and-desist

letters alone do not suffice to create personal jurisdiction" because "even though [they] alone are often substantially related to the cause of action (thus providing minimum contacts), the minimum requirements inherent in the concept of 'fair play and substantial justice' . . . defeat the reasonableness of jurisdiction." Red Wing Shoe Co., 148 F.3d at 1360 (quoting Burger King Corp., 471 U.S. at 477-78). The Federal Circuit further explained that "[a] patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement" and that "[g]rounding personal jurisdiction on such contacts alone would not comport with the principles of fairness." Id. at 1361. Although the Federal Circuit concluded in Red Wing Shoe Co. that the patent-owner's three warning letters alleging patent infringement against a footwear manufacturer "alone [did] not create personal jurisdiction," Red Wing Shoe Co., 148 F.3d at 1361, the circumstances in the present case are distinguishable.

Here, the Morisky Defendants' contacts with BCH through the Austin Letter, emails with Dr. Hartz and the provision of a license from MMAR were not their only contacts with the forum. Dr. Morisky had previously engaged with BCH to negotiate and authorize the Morisky Widget license between BCH and MMAS, see D. 24-1 at 107, both Dr. Morisky and MMAR, through Philip Morisky, knew where BCH was located and that BCH was a Morisky Widget licensee per the CR2A, see D. 63-2 at 2, 4; D. 24-1 at 23-24, and Philip Morisky provided BCH with a license from MMAR despite his obligation under the CR2A to "support as needed to all licensees as long as their licenses to the Morisky Widget are in effect" D. 63-2 at 3. Further, the Federal Circuit clarified the scope of Red Wing Shoe Co., noting that Supreme Court cases following Red Wing Shoe Co. "have made clear that the analysis of personal jurisdiction cannot rest on special patent policies[,]" that "communications sent into a state may create specific personal jurisdiction, depending on the nature and scope of such communications[,]" that "communications threatening

suit or proposing settlement or patent licenses can be sufficient to establish personal jurisdiction" and notably that "there is no general rule that demand letters can never create specific personal jurisdiction." Trimble Inc. v. PerDiemCo LLC, 997 F.3d 1147, 1154-56 (Fed. Cir. 2021) (reversing the district court's order finding a lack of personal jurisdiction which relied upon Red Wing Shoe Co.).

The Court is persuaded that the purposeful availment element is satisfied in this case. MMAS contends the Morisky Defendants purposefully availed themselves of the Massachusetts forum by sending the Austin Letter threatening legal action against Massachusetts-based licensees, including BCH, and by issuing a replacement license directly to BCH, which interfered with MMAS's contractual relationship with BCH. D. 63 at 7-10; see D. 24 ¶¶ 75-79, 95-99, 105. As alleged in the amended complaint, Dr. Morisky's counsel wrote the Austin Letter that was published on Dr. Morisky's website and was emailed to the 200 Morisky Widget licensees listed in the CR2A, including others in Massachusetts, see D. 63 at 8; D. 24 ¶¶ 70, 75, 139; D. 24-1 at 13-45; D. 63-2 at 5, which the Court must take as true and construe those facts "in the light most congenial to the plaintiffs' jurisdictional claim." See Mass. Sch. of Law at Andover, Inc., 142 F.3d at 34. The outreach to all Morisky Widget licensees and publication on the public website is conduct that foreseeably gave the Morisky Defendants notice that they could be subject to personal jurisdiction in Massachusetts and where other existing licensees were located, particularly because the Morisky Defendants were aware of all the Morisky Widget licensees listed in the CR2A, had negotiated at least some of them and agreed to continue to provide licensees with support per the terms of the CR2A. See D. 44-45, 70-76; Nowak, 94 F.3d at 715; see also Nova Biomedical Corp., 629 F2d at 197.

The requirement of "voluntariness" is also satisfied here, where Philip Morisky, on behalf of MMAR and in furtherance of Dr. Morisky's interests, emailed BCH with a letter granting it a

license to use the Morisky Scales with attribution requirements that allegedly undermined the parties' preliminary settlement agreement.  See D. 24 ¶¶ 29, 139; see D. 24-1; see Jack Henry & Associates, Inc. v. Plano Encryption Tech., LLC, 910 F.3d 1199, 1201, 1206 (Fed. Cir. 2018) (holding that exercise of personal jurisdiction over defendant in declaratory judgment action was reasonable where defendant sent communications to eleven banks "identifying . . . patents, stating that the Banks [were] believed to be infringing the patents, and inviting non-exclusive licenses"); Trimble Inc., 997 F.3d at 1157 (concluding that purposeful availment test was satisfied in declaratory judgment noninfringement action where defendant exchanged twenty-two communications with plaintiff in over three months regarding infringement and "went far beyond solely . . . informing a party who happens to be located [in California] of suspected infringement) (internal citation and quotation marks omitted).

In sum, the purposeful availment element is satisfied as to the Morisky Defendants.

### 3.  *Reasonableness Factors*

The reasonableness inquiry is based on a balancing of the following "Gestalt factors":  "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies."  Cossaboon, 600 F.3d at 33 n.3 (quoting Harlow, 432 F.3d at 67).  "The purpose of the [G]estalt factors is to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close."  Nowak, 94 F.3d at 717.  Thus, "the weaker the plaintiff's showing on the first two prongs

(relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster-N.Y., Inc, 26 F.3d at 210.

With respect to the first factor, relative to MMAS, it will be more burdensome for the Morisky Defendants to appear in Massachusetts because Dr. Morisky is domiciled in Nevada and MMAR is a limited liability company incorporated in Nevada and operated from Nevada and California. See D. 54-1 ¶ 4. That is, the burden that litigation would impose on the Morisky Defendants is at least disproportionate to MMAS, which conducts business in Massachusetts. See D. 24 at ¶ 7; Phillips v. Prairie Eye Ctr., 530 F.3d 22, 30 (1st Cir. 2008). That said, "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly," the Morisky Defendants have not demonstrated that the exercise of personal jurisdiction in Massachusetts is "onerous in a special, unusual, or other constitutionally significant way." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994); see D. 54 at 11-12; see Adelson v. Hananel, 652 F.3d 75, 83 (1st Cir. 2011) (concluding that the first factor did not weigh against jurisdiction because defendant had not shown a special or unusual burden in defending an action in Massachusetts "over and above that of doing so in any foreign jurisdiction"). This factor, therefore, does not weigh against jurisdiction.

As for the second factor, MMAS asserts that Massachusetts has an interest in adjudicating this dispute involving the alleged interference with the contractual rights of BCH, a Massachusetts-based institution, and alleged intentional conduct directed at businesses operating in Massachusetts. D. 63 at 11. Massachusetts has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders. See Ticketmaster-N.Y., Inc, 26 F.3d at 211. Accordingly, this factor weighs in favor of jurisdiction.

The third factor requires the Court to consider "the plaintiff's interest in obtaining convenient and effective relief." Cossaboon, 600 F.3d at 33 n.3 (quoting Harlow, 432 F.3d at 67). MMAS contends it "has a legitimate interest in obtaining relief in the forum where the harm

occurred and where its commercial relationships were targeted and disrupted." D. 63 at 11. The Morisky Defendants argue that "[i]n each instance in which the Morisky Defendants are involved in licensing the use of the Morisky Scales, they did not choose the forum" and that it would be unreasonable that the Morisky Defendants "could be haled into court in every jurisdiction in which a license was required by the licensee in that forum for the benefit of that license." D. 54 at 12. As the First Circuit has made clear, "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." Sawtelle, 70 F.3d at 1395 (internal citations omitted); Pritzker, 42 F.3d at 64; Ticketmaster-N.Y., Inc, 26 F.3d at 211. This factor also weighs in favor of exercising jurisdiction.

The fourth factor is the judicial system's interest in obtaining the most effective resolution of the controversy. MMAS asserts that it would be inefficient to fragment this dispute where it involves "co-defendants, facts, and events centered in Massachusetts." D. 63 at 11. This factor is generally considered "a wash," Nowak, 94 F.3d at 718, because "[e]ven though Massachusetts courts can effectively administer justice in this dispute, they have no corner on the market." Baskin-Robbins Franchising LLC, 825 F.3d at 41. Because "it is unlikely that the parties will be able to resolve the dispute without judicial intervention in some forum" if the matter is dismissed here, "[t]he most efficient path for the judicial system . . . is to move forward with the lawsuit in the present forum." Hasbro, Inc. v. Clue Computing, Inc., 994 F. Supp. 34, 46 (D. Mass. 1997). Thus, this factor weighs slightly in favor of exercising jurisdiction in Massachusetts.

Finally, as to the fifth factor, the Court considers Massachusetts' interest in "providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." Burger King Corp., 471 U.S. at 473. This factor, however, does not favor one party or the other. Presumably the parties' home forums have an interest in the prevention of alleged tortious interference with contractual relations and copyright infringement.

Taken together, the Gestalt factors support the conclusion that it would be reasonable to exercise personal jurisdiction here over the Morisky Defendants.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES the Morisky Defendants' motion to dismiss for lack of personal jurisdiction.  D. 54.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge
